LANDRATH and wife, Plaintiffs and Respondents, vs. ALL-
STATE INSURANCE COMPANY, Defendant and Appellant:
FIDELITY & CASUALTY COMPANY OF NEW YORK,
Interpleaded Defendant and Respondent.

*May 7—June 15, 1951.*

For the appellant there was a brief by *Farr & Brown* of Eau Claire, and oral argument by *Donald L. Farr*.

*Frank L. Morrow* of Eau Claire, for the respondents.

*Ramsdell, King & Carroll* and *George M. Carroll*, all of Eau Claire, for the interpleaded respondent.

FAIRCHILD, J.    The difficulties presented by this appeal must be considered from the standpoint of the weight that may be given to the testimony bearing on the answer of "$750" to Question No. 9 (c): "What damages did Clarence Landrath sustain . . . by reason of loss of society and services of his wife?" and to the amount of "$7,000" in answer to Question No. 10: "What damages did Realda Landrath sustain by reason of her injury?"   There are other

points raised by the appellant which will be treated with later in the opinion.

As to the primal question, it may be stated generally that we are concerned as to an existence of facts which show the damage by way of personal injury testified to by respondent, Realda Landrath. Her testimony relating to damage consists of her description of mental and emotional disturbance, with practically a complete absence of objective symptoms. So far as her testimony gives us any facts, the only objective or physical indication of an injury is a scar on her chin. She was in a collision of cars, was thrown forward, striking the windshield, and then thrown back against the seat. The testimony is to the effect that she and her husband were on their way to visit in Niles, Michigan, but because of the accident their automobile was damaged, and they changed their plans. They went from Janesville, where the collision occurred, to Chicago by bus. There they visited with relatives over Sunday; then on Monday they returned to Janesville, transacted some business, and Monday night left by train for Eau Claire. Soon after arriving at home, she called a physician, who saw her on March 18th. On April 21st, Dr. Ihle made an examination of her, resulting in findings as described by him as follows:

"*Q.* And will you tell us what you found on examination? *A.* The patient called attention to an area on the chin which, when examined, felt to be a firm mass that was tender to touch. She was a thin individual that stood erect. The shoulders hung at equal height. There was some flattening of her normal back region and the small of the back. Those areas were somewhat flattened. She demonstrated her back motions to be complete. On the limit of left-side bending, the patient complained of discomfort over the iliac crest which is the prominence on the side of the patient which is usually called the hip. She twisted well to the right and left without a complaint of pain. When she lay face down, the muscles of her back were relaxed. There was no spasm

brought out by thumping the back or muscles. She complained of marked tenderness and squirmed on palpation or pressure over the spinous processes—those are the bumps that stick out along the person's back—when they were pressed in the area between the shoulder blades, specifically thoracic three, four, and five. She had generalized tenderness over all the other spinous processes in the back. There was no muscle tenderness. She had no tenderness along the sciatic nerves that go into the lower extremities. Tests to put stress on these nerves and strain on the vertebrae in the back were negative. That is, they were done without discomfort to the patient; and one test in which the leg is raised straight up from the table with the patient lying on the back caused pain in the back between the shoulder blades. Motions in her upper extremities, that is, the arms, were complete. She had normal muscle power in the arms and hands. The nerves to the upper extremities were intact to the finger tips. Her feet were in satisfactory, weight-bearing position and showed no changes in the nerves or muscles in either leg. X rays of her back were negative for any lesion in the bone structures. That's it. *Q.* Now, following the obtaining of the history that you have stated and your examination of the patient and your observation of the patient, did you make a diagnosis of her condition? *A.* Yes. *Q.* What was your diagnosis? *A.* The diagnosis was strain of the back and neuroma of a sensory nerve on the chin. Mr. Farr: What was that, Doctor? *A.* Neuroma. The Court: Perhaps you better explain this for us. *A.* Neuroma is a little growth or tumorlike mass that forms on a nerve. It's something like a scar that you see in skin, only it has to do with a nerve."

Quoting from facts stated in the appellant's appendix, the doctor also testified:

"Generally the examination revealed no physical basis for her complaint. There was only the expression of pain and discomfort by the patient when the back was pressed on.

That is, the region of the back between the shoulder blades. . . . The X rays were negative. That is, they did not show any trouble with the bone structure. . . . I do not believe that this patient was malingering. I account for the persistence of her complaints beyond a reasonable healing period for a sprain of the thoracic spine by the fact that I believe she was suffering from a neurosis. . . . As I think of neurosis, it is an unconscious, abnormal, physical meaning having to do with things that you can actually feel in the body, response by the body to an injury, to the emotions. . . . A traumatic neurosis could mean a neurosis due to injury. There are other types of neurosis not due to injury. The neurosis of the patient is a traumatic neurosis."

On cross-examination he testified: "*Q.* Other than the bump on her chin, did you find anything physically wrong with her? *A.* No."

While the witness, Mrs. Landrath, evidently co-operated in the examinations made of her and convinced her physicians of the sincerity of her complaints, the doctor did say, quoting from appellant's appendix: "Traumatic neurosis is a condition which often exists when someone is making a claim against another arising out of an accident. In some cases where this condition exists, after the person suffering from this ailment obtains a settlement or the case is disposed of, the condition disappears." The doctor was unable to tell whether or not Mrs. Landrath would recover from her symptoms, but it does so emphatically appear that all objective factors which could be the basis of a complaint are lacking that the point of excessive award by the jury becomes important.

From a statement of facts well established, we quote Dr. Thorsen, who was consulted by Mrs. Landrath, as follows:

"Anyone who gets into an accident where there is a legal question involved is at least aware of the fact that there may be a lawsuit or something of that nature and that may be something that makes some people give a false picture of how

they feel. I have an opinion as to whether or not Mrs. Landrath was malingering. . . . So I tried to investigate to the best of my ability just how important a factor that might be. In my final conclusion, that was a minor factor; that there was no evidence that she was malingering or that the possibility of getting a financial reward was the chief factor behind the emotional disturbance."

On cross-examination the same witness testified:

"I was here when Dr. Ihle testified this morning. . . . Mrs. Landrath, with the exception of the little bump on the chin, showed no physical evidence of any injury upon which he [Dr. Ihle] could find any basis for her complaint, that she had a back sprain or straining. I examined her back and I found, as Dr. Ihle, that there was tenderness but no evidence of injury. I found no physical basis to form a foundation for her complaints. I examined her more than once and not at any time did I find any evidence of physical injury. I saw no evidence of any actual brain injury. . . . I found the spine, on examination, to be perfectly normal. With the exception of the little bump on the chin, she is perfectly normal physically, I don't believe that she was faking or malingering. I think that any idea that she might have of getting money out of her claim is a minor factor. However, I do not rule that out as a factor. I do not rule the money out in her case as a factor altogether."

Another doctor, Dr. Fuson, testified very largely to the same effect, but described her condition as follows: "I find that she is a rather thin, aesthetic type of individual, not a sturdy built, husky type of person. Her weight was one hundred ten pounds at that time [time of accident]. Her chief complaint at the time I first examined her was this pain along the back of her neck, the lower part of her neck, and in between her shoulder blades, and that the pain varied in intensity at different times of the day. At times it would seem to be worse than at other times and, as Dr. Ihle testi-

fied, at night it would bother her off and on.. . . . She had the full and normal range of her neck in all directions, the same way with her back, the upper extremities, the arms and shoulders, and so forth. She complained especially of a sensitive tender spot between her shoulder blades over a rather small area of approximately one inch in diameter. She complained of pain upon my pressing it with my thumb. There was no muscle spasm present nor was there any pain upon pressure upon the top of her head, pressing her head down on her shoulders rather firmly. That, primarily, was just what I found on May 31, 1949. . . . It was my opinion that she did not suffer any injury which should cause a permanent injury or disability. As a result of the accident, she had received a sprain to the back and a bruise, scarring of the chin or right lower lip. . . . She stated that she was doing most of her housework except the washing. She vacuumed her rugs, did the dishes, fixed the beds, fixes her own hair, she is able to move her arms around, wash her hair, wash the back of her neck. There is no limitation of movement."

Dr. Paul, an osteopathic physician and surgeon, gave similar testimony. He saw the patient several times between April 7, 1949, and April 16, 1949.

While the respondents have their causes of action arising out of the appellant's negligence and are entitled to recover damages, from a review of the testimony it is considered that the award of $7,000 to Realda Landrath is excessive, and from the record as now before us, it is considered that $4,500 is the highest amount that a jury properly actuated and upon due consideration would be likely to assess as the damages for pain and suffering for Realda Landrath; and also that the $750 allowed the husband for loss of services and society of his wife is excessive, and that $500 is the highest amount that could be properly awarded under the rule which we are following here to Clarence Landrath for loss of services and

society of his wife. However, in view of the result reached with relation to other points raised, a new trial will not be necessary, should the appellant elect to permit judgment to go against it in favor of respondents for the respective amounts in addition to the other items of damage covered in the special verdict.

The cases cited by the respondents in support of their contention that the amount is not excessive are controlled by facts readily distinguishable from those in this case. For instance, in the case of *Butts v. Ward,* 227 Wis. 387, 279 N. W. 6, $7,000 was awarded for permanent injuries where the evidence warranted the jury in finding that the plaintiff was permanently totally disabled, and $5,000 for pain and suffering caused by injuries requiring the plaintiff's confinement in bed at a hospital for one week, in bed at home for seven weeks, and in a wheel chair for two weeks more, and continuing to cause pain and discomfort nine months after the accident. The facts established in that case showed substantial injuries on which to base the allowance made by the jury.

The jury allowed $750 to the husband for loss of services and society of his wife. This is excessive. In judging the evidence which must be considered as governing that amount, we conclude that when given its due weight, including the wife's testimony of her condition and the testimony of the doctors as to their findings and also the testimony of the wife to the effect that she did assist her husband in conducting the affairs of his business, answering the telephone, writing out slips, and reporting when called upon, the evidence requires holding that $500 is the highest amount to be allowed for such damage to the husband on the record now before us.

With respect to the other items of damage allowed, there is ample evidence to sustain the findings of the jury. As appears from the verdict, the husband was free from negligence, and the only questions now before us with relation to

the allowance of damages are the amount awarded to Mrs. Landrath and the amount awarded to Clarence Landrath in answer to the question as to loss of services and society of his wife.

We must find in the record sufficient competent evidence in respect to the damages to sustain the award. It is considered that the rule followed in the recent case of *Wenneman v. Royal Indemnity Co.* 251 Wis. 630, 30 N. W. (2d) 250, must guide us here. In that case, upon a review of the record, the court was compelled to conclude that the evidence did not admit of the jury's award as damages for plaintiff's pain and suffering caused by an accident, and it was there ruled in effect that the award allowed could be warranted only where sufficient evidence other than the unsupported subjective statements of plaintiff existed.

As to the point raised by appellant in regard to admission of evidence, it is considered that the trial court properly ruled that Dr. Thorsen was a competent witness to testify in this case. The objection to his testimony was based on the fact that he was a nonresident and under the inhibition as a witness contained in sec. 147.14, Stats. That section, however, is modified by sub. (1) of sec. 147.19, and the resulting rule is that physicians of other states in actual consultation with a resident licensed practitioner of this state are not subject to the regulation of sec. 147.14. It is true that Dr. Thorsen was engaged in practice in St. Paul, Minnesota, and was not licensed to practice in Wisconsin, but it does appear that Dr. Ihle, who was treating Mrs. Landrath, is licensed to practice in Wisconsin, and that he sought the assistance of Dr. Thorsen when he determined that his patient, Mrs. Landrath, needed the attention of one engaged in the specialty that Dr. Thorsen was engaged in. A complete history of the patient's condition was sent to Dr. Thorsen when the arrangement was made under the advice of her physician for her to consult Dr. Thorsen. That doctor, in

this exchange made for the assistance of Dr. Ihle in treating Mrs. Landrath, thus became a consultant. Dr. Thorsen treated the patient. He saw her at the Miller Hospital, in St. Paul, over a period of a week, prescribed for her, and gave her psychiatric treatments from November, 1949, to February, 1950. There was a discussion of the case by him with Dr. Ihle, who was her Wisconsin physician at the time. The discussions were over the phone and in letters. After the first of the year (1950) Dr. Ihle had a talk with her at the Luther Hospital at Eau Claire, at which time he formed the opinion which he gave in his testimony as to his prognosis. As we have said, she was referred to Dr. Thorsen, who first saw her November 4, 1949, by a competent, qualified, Wisconsin licensed practicing physician, to whom Dr. Thorsen reported and with whom he consulted. The trial court properly, in the exercise of its discretion, admitted the evidence.

It is our conclusion therefore that there must be a new trial on the question of the allowance of damages to Mrs. Landrath, unless appellant elects to permit judgment to go against it in her favor for $4,500, because we consider this the highest amount at which a fair-minded jury, properly instructed, would probably assess the damages. And a like ruling is made as to Clarence Landrath's award for damages for loss of services and society of his wife, fixing the amount at $500. Within twenty days after the notice of remittitur of the record to the circuit court, appellant may signify its election to permit judgment to go against it in accordance herewith or to have a new trial on the questions of damages under Question No. 9 (c) and Question No. 10 of the special verdict.

*By the Court.*—Judgment affirmed in part and reversed in part. Cause remanded for further proceedings in accordance with the opinion.