DITTMAN, Appellant, vs. WESTERN CASUALTY & SURETY COMPANY, Respondent.

*April 8—May 4, 1954.*

For the appellant there was a brief by *W. W. Ward,* attorney, and *Doar & Knowles* of counsel, all of New Richmond, and oral argument by *Mr. Ward* and *Mr. John Doar.*

For the respondent there was a brief and oral argument by *Frank L. Morrow* of Eau Claire.

STEINLE, J.   Wilmer Dittman at the time of the accident was a farmer residing in the town of Richmond, St. Croix county. He was twenty-eight years of age and in good health except for being troubled with headaches occurring about once a month. He had planned his wedding for the night of Saturday, September 8, 1951, and on the morning of said day, just before the collision, was attending to errands in connection with the wedding. The Stefonek car struck Dittman's car hard on the left side near the rear door and drove it sideways for about 20 feet. Dittman was thrown from his car and lay in a ditch 30 feet away from his car immediately after the impact. He was unconscious for some minutes. He bled at the forehead near the eyebrow. There was a large bump on the back of his head. Dr. Douglas Campbell, whose office at New Richmond was seven miles away from the scene of the accident, was called. Dittman was taken home and given some medicine by Dr. Campbell. The doctor suggested hospitalization but Dittman was unwilling to enter a

hospital. Dittman rested during the balance of the day and started getting a headache that night. He was married at a church on the same night and he and his bride spent the wedding night at Stillwater, Minnesota, and on the next day went to the Dittman farm where they stayed until Monday morning. Dittman noticed on Sunday morning that his back was bruised. He testified that it was, "just as black as a chunk of coal." On Monday he and his wife started on a honeymoon trip to Superior by auto. They were gone three days but shortened the time of their planned trip because Dittman felt sick and wanted to see Dr. Campbell. On Thursday he went to Dr. Campbell's office at New Richmond where he was examined and X rays taken of his head and back. Dr. Campbell injected something in his back and taped it. Dittman did not go to a hospital although the doctor suggested it. Thereafter he went to Dr. Campbell's office on six different occasions, the last visit being October 26th. The doctor prescribed pills and gave him some injections. Dr. Campbell died on November 12, 1951, as the result of a railroad accident. His associate, Dr. J. H. Armstrong, as well as other doctors in the same medical clinic, thereafter treated Dittman. X rays were taken on November 26, 1951. Dittman saw Dr. Armstrong on three different visits thereafter up to January 11, 1952, and also saw that doctor seven times after that date and until the trial on September 17, 1953. Dittman each time complained of backache and headache and Dr. Armstrong gave him something for his headaches. In April, 1953, at the suggestion of his attorney, Dittman started to keep a written record of his ailments. That record indicated periodic headaches and backaches, some dizziness, and a feeling "just like I am going to faint and got to hang onto something." Dittman's complete medical expense was $100.50.

Dittman farmed 400 acres (half under cultivation) and milked 22 cows. His brother helped him with the work. His father, from whom he purchased the farm a short time before the collision, lived with him and helped to some extent. Dittman was not able to work from September 8, 1951, until after Christmas of that year. The farm laborer whom he had hired to help out while he was gone on his wedding trip stayed at $100 per month, room and board, for three months. Dittman lay around most of the time and instructed the other men what to do in regard to the farmwork. He was able to work and did so from after Christmas until the next harvest season when he had to quit for two months because of his ailments. During that period he hired an extra farm hand and paid $125 per month for two months.

Dr. Armstrong at the trial testified that in his opinion Dittman suffered from posttraumatic headaches—hemorrhagenic venous in the brain coverage or the distribution and circulation of the brain—and that such condition resulted from injuries at the time of the accident. He was not able to state that such injuries would remain permanent. He said that he had never taped Dittman nor had he given him injections. He prescribed pills for the headaches. He also testified that Dittman's complaints regarding backache diminished as time went on. He stated that he could not find physical evidence to account for Dittman's continued complaints.

It appears that Dittman had also been examined on one occasion by a neurologist, Dr. Hammes of St. Paul, at the recommendation of Dr. Armstrong. Dittman had also been sent by his attorney to Dr. Healey of New Richmond for an examination. Neither of said physicians was produced as a witness at the trial. While Dr. Armstrong testified that in his opinion Dittman was not an individual whose symp-

toms would disappear once the lawsuit was over, he nevertheless said that the neurologist, Dr. Hammes, did not agree with him.

Dr. J. E. Newton of Hudson examined Dittman on the day before the trial and testified on behalf of the defendant. He stated that while Dittman complained of headaches and backaches the physical findings were negative and he could not account neurologically or otherwise for Dittman's complaints.

The court and jury had before it no competent evidence of permanent partial disability, and none of future disability or future pain and suffering. Other than the laceration on the forehead, the bump on the head, and the bruise on the back, all of which apparently cleared up shortly after the accident, since no reference is reflected in the record showing persistency after the normal period of healing, the physicians even with the aid of X ray were unable to find any objective symptoms. The only treatment was that administered by Dr. Campbell and Dr. Armstrong, and by two others of the clinic. Dr. Campbell on the day of the accident gave Dittman some medicine. Five days later he taped his back and gave him an injection. For several weeks thereafter on occasions he gave an injection and pills. Dr. Armstrong testified that his only treatment consisted of prescribing pills. The other members of the clinic merely prescribed pills.

Appellant maintains that the court did nothing more than substitute its own judgment for that of the jury. He predicates such contention principally on the trial court's failure to have incorporated an analysis of the evidence in its order; failure to set forth in detail the reasons that prompted the order; the absence of finding that the jury acted from prejudice or passion; and also the failure of the defense to have contradicted the evidence of plaintiff.

We find nothing in the record to indicate that the trial court here attempted to impress its personal view as to the worth of the claim for injuries when it made its order. It found that the damages were excessive and higher than that which a fair-minded jury would probably allow. It was the function and duty of the court to have made such determination when it became satisfied that the evidence did not warrant such a finding or when it believed that the verdict was the result of prejudice, passion, ignorance, or bias.

By its reference in the order that $3,500 is the highest amount which a fair-minded jury would probably assess the damages, the court implied that the jury in this case was not fair-minded when it rendered a damage verdict for $4,700. Obviously the court was of a mind that the verdict was the result of prejudice, passion, ignorance, or bias.

The court, under circumstances as here, was not required to provide written analysis of the evidence. True, it was the duty of the court to review the testimony and weigh it as to damages. The court heard the arguments of counsel with respect to their motions after verdict and then rendered its decision. The defendant in its motion after verdict had contended that the damages were excessive and reflected passion and prejudice on the part of the jury. It does not appear that the court failed to give the consideration that was required. Under sec. 270.49 (2), Stats., the court was obliged to specify the grounds for its order granting a new trial. Such was done. There was no obligation to set forth the reasons in detail. Such procedure is required only by the statute when the order granting the new trial is "in the interest of justice." The trial court in its order here followed the procedure and form employed by this court in *Landrath v. Allstate Ins. Co.* (1951), 259 Wis. 248, 48 N. W. (2d) 485, where an option fixing the highest award that a fair-minded jury would find, was directed.

Appellant urges that since its medical evidence was not contradicted, the verdict must stand. It does not appear that plaintiff's medical evidence was entirely uncontradicted as to material matters. While Dr. Armstrong testified to an opinion based principally upon subjective symptoms that the headaches were posttraumatic, Dr. Newton was unable to form such conclusion. According to Dr. Armstrong's testimony Dr. Hammes, to whom he sent the patient for examination, did not agree with him as to his opinion that the symptoms would not disappear when the lawsuit was concluded. Neither physician offered by the parties was able to find physical evidence to account for Dittman's complaints. We take cognizance, however, that Dr. Armstrong testified that he was convinced of the sincerity of Dittman as to his expressed subjective symptoms.

According to the record, the special damage other than property damage which had been separately allowed, amounted to $550 hire for two men, and room and board for one man for three months, in addition to the doctor bill of $100.50. The difference between such total sum of $650.50 plus the room-and-board item and the sum of $4,700 represented the jury's award for pain and suffering. This would amount to slightly under $4,000. It is obvious that the trial court was of the opinion that the damage fixed by the jury for pain and suffering was not sustained by the evidence and was entirely disproportionate to that allowed for such item in other cases even considering the present economic value of the dollar. It must be borne in mind that, in making a comparison with other verdicts in a situation such as this, the court will look not so much to the particular nature of the injury in the cases, as to the magnitude of the element of the pain and suffering of the victim.

In *Wenneman v. Royal Indemnity Co.* (1947), 251 Wis. 630, 30 N. W. (2d) 250, it was held that a $3,000 award by the jury for pain and suffering was excessive. In that case the evidence indicated that the plaintiff was struck on the back of the neck and rendered unconscious for fifteen minutes. His back and side of his head and his legs were badly bruised. For five months thereafter he had pain in his neck, ears, and spine, and until the trial had a dull pain in the neck bone above the shoulder constantly. He also had pain in the lower part of the back. He testified that he suffered a loss of hearing and bled from his ear the second day after the accident and about three times afterward, and his hearing was affected immediately after the accident and that such condition continued until the trial. He also complained of a dull ache in his ear which was constant and claimed loss of hearing in both ears. There, as here, the complaints were entirely subjective. This court at page 634 of said case observed that:

"Our review of the record compels the conclusion that the evidence does not admit of the jury's award of $3,000 as damages for plaintiff's pain and suffering caused by the accident. An award of that amount would have been warranted only if there had been sufficient evidence,—otherwise than unsupported subjective statements of plaintiff,—to admit of the jury finding that, because of injuries sustained as the result of the accident,—including his claimed impairment of hearing, if established by competent evidence,—he will probably continue to have such pain and suffering for such period beyond the date of the trial as to entitle him to recover some such substantial amount as damages therefor."

We believe that the instant situation is also reasonably comparable to that detailed in *Forecki v. Kohlberg* (1941), 237 Wis. 67, 295 N. W. 7, 296 N. W. 619, where an award of $4,000 for injuries was found to be highly excessive.

In *Urban v. Anderson* (1940), 234 Wis. 280, 285, 291 N. W. 520, this court said:

"It is quite clear that in a case where the jury has returned a fatally excessive verdict, where the right to recover is clear, the court may deal with the matter whether the error is attributable to perversity, or the amount found by the jury is not supported by the evidence in the case. The whole object and purpose of giving options is to permit the parties to avoid the expense of a new trial. The granting of options is based upon the proposition that the trial court has power to thus deal with a verdict without invading the constitutional rights of either party. *Heimlich v. Tabor* (1905), 123 Wis. 565, 102 N. W. 10. In cases where the amount of damages returned by the jury indicates perversity, passion, or prejudice, the court may deal with the matter if it appears that the perversity, prejudice, or passion did not otherwise affect the findings of the jury."

We assume that here the trial court was in possession of all the facts as well as the atmosphere of the case to enable it to do evenhanded justice. We are obliged to declare, as we did in *Hale v. Schultz* (1936), 223 Wis. 285, 286, 270 N. W. 46, that, "The judgment of the trial judge on the question of whether damages are excessive or not must be accorded considerable influence when the matter is presented to this court. He has seen the witnesses and heard the testimony."

The fixing of a maximum amount was wholly within the discretion of the trial court. After a careful review of the record we are compelled to the conclusion that the trial court did not abuse its discretion when it determined that the damages found by the jury for pecuniary loss and pain and suffering were excessive and in submitting the option whereby the defendant was privileged to pay $3,500 plus the property damage of $211.06, or take a new trial.

*By the Court.*—The order granting a new trial to determine the amount of damages as to pecuniary loss and pain and suffering, is affirmed.