BURMEK, Respondent, v. MILLER BREWING COMPANY, Appellant.

*January 9—February 7, 1961.*

For the appellant there was a brief by *Arnold, Philipp & Murray* of Milwaukee, and oral argument by *Suel O. Arnold*.

For the respondent there was a brief and oral argument by *Herbert L. Mount*, attorney, and *John A. Keck* of counsel, both of Milwaukee.

MARTIN, C. J. In January, 1955, plaintiff was an employee of the Lemberg Electric Company, a subcontractor of the Derse Advertising Company, which was in charge of defendant's outside advertising for the celebration of its 100th anniversary. The work of the Lemberg Electric Company was to bring electric power from the brewery premises to street poles on which illuminated decorations were to be mounted.

Norman Haag, electrical engineer for the defendant company, sketched a design for the electrical work to be done, laying out the sources of power and the specifications for the installation. Three sources of power were indicated and two of them were actually used by plaintiff as he carried on the work. The third, as called for by the plans, was to be a structure referred to as the "truckers' control tower." That source was found to be overloaded and Haag suggested plaintiff should use a panel in the truckers' rest room.

The truckers' rest room was a building 48 feet long and 22 feet wide and had a flat, concrete roof with no rails or guards around it. About one half of this building was inclosed within defendant's warehouse No. 38. The roof of that part of the truckers' rest room which was within the warehouse was six feet, 10½ inches below the joists supporting the roof of the warehouse proper; it was a little over 11 feet above the warehouse floor.

This rest room was located at the east wall or side of the warehouse. Between the north end of this room and the north wall of the warehouse was an empty space about seven feet wide. The warehouse proper was used by defendant for storage of beer containers which were placed in position with

lift trucks. The space at the north end of the truckers' rest room was not used for such storage because it was too small to permit operation of the lift equipment.

Defendant made no use of the roof of the truckers' rest room. There were three light fixtures affixed to the joists of the warehouse roof in the area of the rest room, two feet west of the west wall thereof. These fixtures dropped about 18 inches in line with the beams, and each had a 12-inch reflector. The northernmost of these fixtures was just north of the north wall of the rest room. There were beer containers stored along the west wall of the rest room to a height close to the light fixtures. No containers were stored along the south wall of the rest room. Immediately adjacent thereto was a wide door leading into the warehouse.

The power source which Haag suggested that the plaintiff use was at a panel located on the inside of the south wall of the rest room. Plaintiff testified that Haag told him—

"To come out of the back of this service panel, run the conduit up and over but not on the platform of this so that nobody would trip, and then to take this conduit up on the ceiling, which would—and to the east end of this ceiling, and all the way to the front of the building; instead of punching through the direct front of the building we should angle out and come through with a service head way at the north end."

Haag denied he gave any instructions to plaintiff with respect to the manner in which he was to get the power to the northeast corner of the building, but admitted he told him he wanted the power line to come out on the east side of the warehouse and not on the north side, so as to avoid defacing a sign.

On January 6, 1955, plaintiff asked his helper, one Pollack, to get a ladder from the Lemberg truck parked just outside the warehouse and climb up on the roof of the truckers' rest room. Pollack did so, then came down and told plaintiff it was dark up there. Plaintiff made an investiga-

tion to see whether all of the switches were on in the warehouse and then climbed onto the roof of the rest room from the ladder placed at the south wall of the rest room. Pollack followed him. He testified he knew that two of the lights closest to the rest room were not burning. Neither of the men had a flashlight or an extension cord, although there was an extension cord in their truck. When plaintiff reached the roof he noticed it was of concrete, that there was no barrier or railing at the south end but that beer cases piled practically to the ceiling along the west wall from the southwest corner of the roof provided a barrier for some distance to the north. He walked to the north, looking at the ceiling of the warehouse to determine what he would have to fasten his conduit to, planning to run the wire along the ceiling and out the east wall close to the north wall of the warehouse. He did not look down again. He fell off the north end of the roof.

It is plaintiff's position that the defendant violated the safe-place statute, sec. 101.06, both with respect to lighting conditions in the area of the rest-room roof and in failing to provide a guardrail. The jury found negligence only with respect to the lighting conditions. Defendant contends that the roof in question was not a place of employment and that it was not in its custody and control at the time of the accident. It relies on the rule of *Potter v. Kenosha* (1955), 268 Wis. 361, 68 N. W. (2d) 4, that when an owner turns over to an independent contractor the complete control and custody of a safe place and then the contractor changes the premises creating a hazardous condition, the owner does not become liable under the safe-place statute to the contractor's employee injured as a consequence of such condition. In that case the city entered into a contract for installation of a sanitary sewer. After the contractor had dug a trench, three of his employees went down into it to do some manual digging. No shoring had been constructed to support the wall

of the excavation and one of the banks caved in, trapping Potter and causing his death. The situation differs here. There is no evidence that plaintiff made any changes in the roof area. He went upon the roof to examine the ceiling of the warehouse to which he intended to fasten his conduit. The hazardous condition was the dropoff at the north end of the roof about which plaintiff was not notified and which was not adequately illuminated, all of which defendant knew. This condition was not of plaintiff's doing, as was the condition in the Kenosha sewer case.

In holding that the roof was a place of employment, the trial court relied on *Bellmann v. National Container Corp.* (1958), 5 Wis. (2d) 318, 92 N. W. (2d) 762. There Bellmann, an employee of a heating contractor, was making repairs to heating and ventilating equipment which had previously been installed by his employer in a building leased by the defendant. The equipment was housed in an area under the roof, the bottom of which area was a false ceiling over which two planks had been laid. Bellmann fell through the ceiling, which admittedly would not sustain a man's weight. This court held there was nothing in the record to show that the contractor, in installing the equipment, was required to inclose the area or provide a safe runway; that the main issue in the case was whether the defendant furnished a safe place of employment; that there was sufficient evidence to sustain the jury's finding that it did not.

We agree with the defendant that the composition of the roof itself in this case was safe. The question whether it was safe with respect to lighting conditions at the north end, however, was for the jury. There is evidence from which the jury could conclude that the beer containers were stacked so high along the west wall of the rest room as to diffuse the light from the warehouse-ceiling fixtures; that the stacking of the containers extended to the north along and beyond that wall so as to form an inclosure of the area at the end of the

north wall of the rest room and interfered with any illumination of that area. Plaintiff's plans known to defendant were to bring the wire out at the northeast corner of the warehouse, which was above the open space between the end of the rest room and the north wall of the warehouse. The dropoff seven feet short of the warehouse wall was a condition of which he was not informed by defendant and one which he could not ascertain without adequate illumination of that area. The defendant in the *Bellmann Case* violated the statute in providing a flimsy flooring in the area in which Bellmann had to work; the defendant here did so by failing to illuminate the area in which plaintiff worked which had no flooring at all, a deceptive condition since it existed at the end of a platform which plaintiff used to walk upon while examining the ceiling above.

Defendant's argument that it had no notice of any unsafe condition is without merit. Admittedly Mr. Haag knew of the space between the warehouse wall and the north end of the rest room. Defendant knew or should have known that the stacking of the containers in that area so interfered with the light there as to render the open space dark and indistinguishable. It knew or should have known that plaintiff would be working in that area. If, as defendant argues, the roof of the rest room was dead, unused, and unusable space so far as the use of the warehouse was concerned, Haag knew it would become a place of employment when plaintiff and his helper moved into that area to carry the conduit to the northeast corner of the building. There is some conflict in the evidence as to whether Haag told plaintiff to run the conduit over the rest-room roof and on the inside of the warehouse to the northeast corner, as plaintiff testified and which Haag denied. Haag testified he left it to the plaintiff to determine the most-practical way of attaching the conduit so long as it would lead out at the northeast corner. As to his conversation with plaintiff on the day prior to the acci-

dent, Haag testified he said he did not want the conduit on the outside of the building or on the front of the sign—

"I remember telling him about the north wall, the sign, we didn't want to deface that. Bring out your conduit so that you can get out at that corner."

He further testified he gave plaintiff permission to drive a hole through the side of the building at the northeast corner. The evidence is sufficient for the jury to conclude that Haag knew plaintiff intended to run the conduit on the inside of the warehouse from the panel in the rest room to the northeast corner, an operation which would require his working above the roof of the rest room and into the open space where the accident happened. A study of a diagram of the building shows that it was the most-feasible way to run the conduit.

Under those circumstances it was defendant's duty either to inform the plaintiff that the roof of the rest room ended short of the north wall of the warehouse or to so illuminate the roof area as to make that condition apparent. Plaintiff's description of it as a "trap" pretty well describes the place.

Defendant argues it did not know when plaintiff was going to do the work during the course of which the accident happened. The contract required that the work by Lemberg be completed by January 10, 1955. Haag knew that plaintiff was working on the last electrical hookup and that the job was to be finished within a few days. Defendant had every reason to anticipate that plaintiff was about to work in this area and if there was not time to make the lighting conditions adequate, it could have given plaintiff warning of the fact that the roof did not extend all the way to the warehouse wall. The issue of notice was a jury question and the evidence is sufficient to sustain the finding.

It is next contended by defendant that the negligence of the plaintiff was at least equal to defendant's as a matter of

law. The jury found plaintiff negligent with respect to his own safety as to lookout and providing himself with adequate lighting. It apportioned the negligence 35 per cent to him and 65 per cent to the defendant. In refusing to disturb the apportionment the trial court cited *Taylor v. Western Casualty & Surety Co.* (1955), 270 Wis. 408, 411, 71 N. W. (2d) 363, where it was held:

"The apportionment of negligence is the peculiar province of the jury. The degree of negligence attributable to a party is not to be measured by the character thereof nor by the number of respects in which he is found to have been at fault. It is the conduct of the parties considered as a whole which should control. In other words, once it has been established that each has been negligent, it is then the jury's function to weigh their respective contributions to the result, which will, regardless of the nature of their acts or omissions, determine which made the larger contribution and to what extent it exceeds or is less than that of the other."

It is true that plaintiff knew it was dark on the roof and that he could have supplied himself with light. He testified, however, that there was sufficient light at the south end of the roof to observe the floor, that as he proceeded north the light was gradually blocked out by the cases piled along the west wall of the rest room, "but we could see the ceiling to see where we were going to run this conduit to the front of the building."

It was for the jury to apportion the negligence. Defendant cites several cases which have no application here. In none of them is there the factor of the plaintiff's preoccupation or diversion occasioned by concentration on his work. As the trial court instructed (*Cook v. Wisconsin Telephone Co.* (1953), 263 Wis. 56, 63, 56 N. W. (2d) 494):

". . . a person required to work in a place of danger is not required to give that undivided attention to the danger

which threatens him as is required of a person with nothing to distract his attention from it. A momentary diversion of attention or preoccupation in the discharge of duties minimizes the degree of care required in the absence of such diversion or preoccupation."

We cannot agree with defendant that there is no factual basis for this instruction. Plaintiff made an observation of the roof when he came upon it at the lighted south end, finding it was of concrete and level. He apparently assumed it continued all the way to the wall of the warehouse and, making no further examination of it, proceeded north with his attention on the structure of the warehouse ceiling where he planned to fasten the conduit. The apportionment was for the jury.

The jury set the damages for plaintiff's pain and suffering, past, present and future, at $42,000. The trial court held this was excessive, reduced it to $30,000 as the least amount that an unprejudiced jury properly instructed would assess under the evidence, and gave plaintiff the option to accept that amount in lieu of a new trial. Defendant complains that the allowance for pain and suffering bears no reasonable relationship to the $4,494 allowed for medical and hospital expense and $20,000 for permanent disability.

In his fall, plaintiff received a crushed vertebra and a severe fracture and dislocation of the right ankle. The lower end of the tibia had been forced through the skin and boot which plaintiff wore. Immediately after the accident he was hospitalized for several months. After a long surgical procedure to realign and repair the ankle, a sloughing wound developed which was still being treated after his discharge from the hospital. His condition was such that he could not stand manipulation of the spine to treat the crushed vertebra, so he was placed for several weeks in a hyperextension frame in which his back was arched backward to prevent further

compression. The ankle joint deteriorated, dropping the foot so that plaintiff could not step on it. He also developed a thrombophlebitis complication in the leg. In November of 1955, he was returned to the hospital where surgery was performed to stiffen the ankle joint so that it could bear his weight. Fusion of the bones necessitated use of a turnbuckle apparatus which required more pressure every few days. After this operation the ankle was fused but the foot turns outward and the doctors recommend further bone surgery to correct the deformity.

Dr. David Ansfield, plaintiff's surgeon, testified plaintiff suffered severe pain in both back and ankle continuously during the two periods of hospitalization and between. Dr. Bruce Brewer, who examined plaintiff in December, 1957, testified the spinal condition is painful, there is a probability of degenerative arthritis there, and it may be necessary to have a spinal fusion if the pain increases to the point where it is disabling. It was his opinion that plaintiff has had considerable pain during the last four or five years and will continue to have pain in the ankle even if further surgery is performed.

Defendant cites a number of cases involving ankle and leg fractures, to which it invites comparison of the amounts awarded. As this court said in *Dittman v. Western Casualty & Surety Co.* (1954), 267 Wis. 42, 49, 64 N. W. (2d) 436:

"It must be borne in mind that, in making a comparison with other verdicts in a situation such as this, the court will look not so much to the particular nature of the injury in the cases, as to the magnitude of the element of the pain and suffering of the victim."

Although the record establishes considerable pain and suffering, we agree with the trial court that the allowance of $42,000 is excessive. The court, in reducing that amount to

$30,000, stated it was "the least amount that an unprejudiced jury properly instructed would under the evidence probably assess." We consider $30,000 a reasonable award for pain and suffering in this case. But if that were not so, the plaintiff was given the option and accepted it. He cannot now seek a review of what he has accepted.

It is contended by defendant that the trial court committed several errors in the instructions. As to the area in question being a place of employment and in the custody and control of the defendant, we have covered that in the forepart of this opinion. The questions of knowledge or notice to the defendant of the lighting conditions in the warehouse have also been discussed, as has the instruction with respect to the degree of care required of the plaintiff by reason of his preoccupation with his work.

Finally, it is contended there was error in instructing the jury that Employers Mutual Liability Insurance Company, Lemberg's workmen's compensation carrier, had made certain expenditures for plaintiff's care and treatment and had assigned its interest to the plaintiff for the purposes of this action. The jury was instructed not to deduct from any damages allowed to plaintiff any amounts which had been paid by Employers Mutual since the carrier would have a first lien on a judgment to reimburse it for its expenditures on plaintiff's behalf. The trial court's reason for including the instruction was that an agent of the compensation insurer was called as a witness to establish the medical expenses paid by the carrier and the omission of the instruction would have left the inference that plaintiff was receiving a gratuitous sum to compensate him for the medical expenses. It should be noted that counsel for defendant created this situation, having declined to stipulate the amount expended by the insurance company. The cross-examination regarding these

bills shows no reason to believe that the bills were improper or excessive. In any event, it is not argued that the instruction was prejudicial to the defendant and we cannot say that it was.

*By the Court.*—Judgment affirmed. Respondent's request under Supreme Court Rule 10, sec. 251.264, Stats., for permission to tax costs of brief in excess of 50 pages is granted.