YOUNG, Plaintiff and Respondent, v. ANACONDA AMERICAN BRASS COMPANY, Defendant and Appellant: BALLARD and another, d/b/a KENOSHA DECORATING COMPANY, Third-Party Defendants and Respondents.

*No. 265. Argued May 7, 1969.—Decided June 3, 1969.*
(Also reported in 168 N. W. 2d 112.)

38

40

42

For the appellant there was a brief by *Vaudreuil & Vaudreuil* of Kenosha, and oral argument by *Leo E. Vaudreuil.*

For the respondent there was a brief by *Phillips & Richards* and *Charles J. Richards,* all of Kenosha, and oral argument by *Charles J. Richards.*

For the third-party defendants-respondents there was a brief by *Merten, Connell & Sisolak,* attorneys, and *James G. Sisolak* of counsel, all of Milwaukee, and oral argument by *James G. Sisolak.*

BEILFUSS, J. The issues raised by Anaconda's appeal are:

1. Was the plaintiff a trespasser, as a matter of law, within the meaning of the safe-place statute?

2. Did negligence of the plaintiff equal or exceed the negligence of the defendant, Anaconda, as a matter of law?

3. Were the damages awarded to the plaintiff excessive?

4. Is the defendant, Anaconda, entitled to indemnity from Ballard for all of the money required to be paid to the plaintiff?

The issues raised by Ballard's motion to review are:

1. Is Anaconda entitled to any indemnity?

2. Is there any credible evidence that Ballard was negligent?

3. Did the trial court err in refusing Ballard's requested instructions?

4. Did the trial court err in permitting a second amendment to its cross complaint?

5. Does the judgment conform to the trial court's decision insofar as Ballard's obligation to Anaconda is concerned?

It is the contention of Anaconda that the beam (upon which the plaintiff stood and fell) was not intended to be used to walk on or a vantage point or platform; that it was merely to serve as a base for the trolley rail; and that the plaintiff was in fact a trespasser at the time and place of his injury.

We are of the opinion Young was not a trespasser at the time and place in question and that he was a frequenter within the meaning of the safe-place statute.

Pertinent sections of the safe-place statute are as follows:

"**101.06 Employer's duty to furnish safe employment and place.** Every employer shall furnish employment which shall be safe for the employes therein and shall

furnish a place of employment which shall be safe for employes therein and for frequenters thereof and shall furnish and use safety devices and safeguards, and shall adopt and use methods and processes reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employes and frequenters. Every employer and every owner of a place of employment or a public building now or hereafter constructed shall so construct, repair or maintain such place of employment or public building as to render the same safe."

"101.01 (5) The term 'frequenter' shall mean and include every person, other than an employe, who may go in or be in a place of employment or public building under circumstances which render him other than a trespasser."

Anaconda knew that Ballard's employees intended to use the overhead cranes to facilitate painting the ceiling. The painting was to be completed in the two week lay off or vacation period. The ceiling was 35–40 feet from the floor level. If the cranes and trestles were not used scaffolding would have to be erected. Both time and money could be saved by the use of the cranes.

Although the plant was closed, Anaconda had a maintenance crew at work. One of the members of the crew was specifically instructed to and did move the cranes at the painters' request to expedite the painting work.

A Mr. Korf, the electrical foreman of Anaconda, testified that the trolleys were oiled and greased on a regular schedule and that as part of this process excess oil or grease on the machines or on the tracks or beams was to be wiped or cleaned off. He further testified the overhead crane had been used as a vantage point for painting and that it was also used periodically by electricians, machinists and steelworkers.

The general rule is that an employee of an independent contractor working upon the premises of an owner is a frequenter working in a place of employment.[1]

There is nothing in the record to suggest that Young was instructed not to use the beams of the crane. On the contrary he was specifically permitted to do so by Anaconda and Anaconda's employees knew or should have known that it was probably the outside beam that would be used. The facts of this case, in our opinion, clearly demonstrate that Young was a frequenter.[2]

The jury apportioned 70 percent of the causal negligence to Anaconda and 10 percent to Young (the other 20 percent was attributed to Young's employer, Ballard). Anaconda does not dispute that the place of employment was unsafe but contends that the negligence of Young, as a matter of law, was equal to or greater than its negligence.

This court has consistently held that the apportionment of negligence is within the special province of the jury and it is only where it clearly appears that negligence of one party equals or exceeds that of another that the court will interfere.

However, the court did state in *Rewolinski v. Harley-Davidson Motor Co.* (1966), 32 Wis. 2d 680, 684, 146 N. W. 2d 485:

[1] *Criswell v. Seaman Body Corp.* (1940), 233 Wis. 606, 290 N. W. 177; *Mustas v. Inland Construction, Inc.* (1963), 19 Wis. 2d 194, 120 N. W. 2d 95, 121 N. W. 2d 274; *Neitzke v. Kraft-Phenix Dairies, Inc.* (1934), 214 Wis. 441, 253 N. W. 579.

[2] The cases cited by Anaconda are distinguished on their facts: *Newell v. Schultz Brothers Co.* (1942), 239 Wis. 415, 1 N. W. 2d 769; *Grossenbach v. Devonshire Realty Co.* (1935), 218 Wis. 633, 261 N. W. 742; *Hanlon v. St. Francis Seminary* (1953), 264 Wis. 603, 60 N. W. 2d 381; *Kuhlman v. Vandercook* (1942), 241 Wis. 418, 6 N. W. 2d 235; *Asen v. Jos. Schlitz Brewing Co.* (1960), 11 Wis. 2d 594, 106 N. W. 2d 269.

"A court undoubtedly has authority to overturn a jury's apportionment of negligence in safe-place cases as well as in ordinary negligence matters. *Klein v. Montgomery Ward & Co.* (1953), 263 Wis. 317, 57 N. W. (2d) 188. Although there is judicial reluctance to change the jury's apportionment and to find a plaintiff at least equally negligent, the court will do so where 'the evidence of the plaintiff's negligence is so clear and the quantum so great.' *Schwarz v. Winter* (1956), 272 Wis. 303, 309, 75 N. W. (2d) 447."

Young testified that he did not look to see if any grease had accumulated on the beam. At most he just glanced at it. He stated that he was accustomed to walking on narrow beams at high places and that he did not look down, and that to him it was just like walking on a sidewalk. He knew that there might be oil or grease around machinery but did not expect any such quantity of grease where he stepped. He did see the grease after he started to slip; it was about one-eighth to one-fourth inch deep.

The plaintiff asserts that not only is the degree of care imposed on an owner of a place of employment higher than the degree existing at common law, but the employee's contributory negligence is less when his act or omission has been committed in connection with the performance of his duties.

To support this contention he cites *Meyer v. Val-Lo-Will Farms* (1961), 14 Wis. 2d 616, 111 N. W. 2d 500. In that case, although factually unrelated to the present case (it dealing with a toboggan run known to be unsafe by the plaintiff), the court said at page 622:

"Conduct constitutes negligence if the risk of harm involved is of such magnitude as to outweigh what the law regards as the utility of the act or the manner in which it is done. The *Puza, Sweitzer, Washburn,* and *Mennetti Cases,* . . . all involved plaintiffs who were injured in the course of performing the duties of their employment or business. This fact may bear upon the reasonableness of their exposing themselves to a particular risk."

The import of this language is that it may be more reasonable to assume certain risks in the employment situation than in other situations. An employee who goes to work upon a roof assumes the risk of falling off. Where, however, he is concentrating on his work and the danger is obscured and in darkness, his negligence has been held not to exceed that of the employer. *Burmek v. Miller Brewing Co.* (1961), 12 Wis. 2d 405, 414, 415, 107 N. W. 2d 583, states:

" '. . . a person required to work in a place of danger is not required to give that undivided attention to the danger which threatens him as is required of a person with nothing to distract his attention from it. A momentary diversion of attention or preoccupation in the discharge of duties minimizes the degree of care required in the absence of such diversion or preoccupation.' " [3]

In *Presser v. Siesel Construction Co.* (1963), 19 Wis. 2d 54, 62, 63, 119 N. W. 2d 405, we said:

"It is, of course, true that ordinarily when one walks in the dark it requires a greater degree of effort to exercise care commensurate with this danger. Reliance is placed upon *McNally v. Goodenough* (1958), 5 Wis. (2d) 293, 92 N. W. (2d) 890, wherein this court held a frequenter was at least 50 percent negligent as a matter of law in walking through a poorly lighted hallway through an open door. In that case the plaintiff's attention was required to be concentrated upon finding his way out of the building. The case is not on all fours with the facts of the instant case. Here, the plaintiff was at work, knew the layout of his surroundings. He knew his toolbox was on the elevator floor close by. What the plaintiff did not know was that another workman in the plaintiff's absence had sent up the elevator exposing the pit and in one sense creating the danger. The preoccupation of a workman

[3] The employee obviously cannot ignore potential dangers. In *McNally v. Goodenough* (1958), 5 Wis. 2d 293, 92 N. W. 2d 890, the plaintiff walked into a darkened doorway of a building unfamiliar to him and fell down a flight of stairs. As a matter of law his negligence was held to be equal to that of the defendant.

in the discharge of his duties should be considered in determining his percentage of negligence and the care required of him for his own safety. Taking the situation at the moment before the accident that the magazine room was constructed with a pit eight feet deep, that such pit was only exposed and dangerous when the elevator was at ground level and that it was reasonable for the place to be in darkness as the plaintiff was following instructions not to hook up the welding machine without pulling the power switch, we have the question, whether the plaintiff was equally or more negligent in not ascertaining whether the elevator was at magazine level or in not taking more precautions in walking in the darkness than the general contractor was in not providing a barricade for the safety of employees and others. The jury did not think so and found the plaintiff 40 percent negligent. The question is a close one and we cannot hold as a matter of law the jury was wrong." [4]

The cases cited deal with the question of whether it was reasonable, under the circumstances, for the plaintiff to proceed as he did unaware of the dangers about him. Thus, where the plaintiff is preoccupied by his work, momentarily distracted or familiar with the premises, his conduct in relation to the then existing dangers may be reasonable.

Unlike the case of *Klein v. Montgomery Ward & Co.* (1932), 263 Wis. 317, 57 N. W. 2d 188, cited by the defendant, where the plaintiff deliberately stepped into an area of danger when safer routes were open to him, the plaintiff in the present case did not know there would be grease in the particular spot into which he stepped. This was his first time on that particular beam. He did realize that it could be slippery on the beam because of the accumulation of oil and grease but he did not believe there could be enough to cause him to fall. He stated that he did not look closely to determine if there

[4] *Dolphin v. Peacock Mining Co.* (1914), 155 Wis. 439, 144 N. W. 1112; *Uhrman v. Cutler-Hammer, Inc.* (1957), 2 Wis. 2d 71, 85 N. W. 2d 772.

was grease but had he done so he would not have walked where he did. He walked there as if he were walking on the sidewalk. He believed himself to be some 40 feet from the floor.

On the other hand, he was performing his work in the usual manner as directed by his employer and the defective condition was created by Anaconda permitting grease to accumulate on a beam that it knew was to be used as a temporary platform for workers. At the time he stepped on the grease his attention was distracted because he was trying to move the 24 foot aluminum plank. He did have a duty to inspect the area for his own safety but his distraction just before and at the time of the accident was understandable and specifically related to his work.

The jury did find Young negligent to the extent of 10 percent of the total causal negligence. While another jury or another trier of fact might have found a higher percentage of negligence on the part of Young, we cannot say as a matter of law that his negligence equals or exceeds that of Anaconda. In recognition of the principle that the apportionment of negligence lies within the province of the jury, the finding of 10 percent negligence on the part of Young must stand.

Anaconda asserts the damage award of $75,000 for personal injuries is excessive.

The jury awarded the plaintiff $14,500 for loss of earning capacity to the date of trial and the parties stipulated as to his medical expenses.

The only item in dispute is the $75,000 awarded for personal injuries. Personal injuries as used in this verdict included pain and suffering to date of trial, future pain and suffering, and future loss of earning capacity.

" 'The standard of this court's review is that where there is any credible evidence which under any reasonable view supports the jury finding, especially when the verdict has the approval of the trial court, it should not be disturbed.' *Bach v. Liberty Mut. Fire Ins. Co.,*

*supra,* page 82; *Metcalf v. Consolidated Badger Co-operative* (1965), 28 Wis. 2d 552, 561, 137 N. W. 2d 457; *Springen v. Ager Plumbing & Heating, Inc.* (1963), 19 Wis. 2d 487, 120 N. W. 2d 692; *Erdmann v. Milwaukee Automobile Mut. Ins. Co.* (1963), 20 Wis. 2d 439, 122 N. W. 2d 430.

" 'This court views the evidence on damages in the light most favorable to the plaintiff. [Cases cited.] Courts are reluctant to interfere with jury determinations of damages. [Cases cited.]' *Burlison v. Janssen* (1966), 30 Wis. 2d 495, 506, 141 N. W. 2d 274." *Burke v. Poeschl Brothers, Inc.* (1968), 38 Wis. 2d 225, 239, 156 N. W. 2d 378.

The trial court, in its memorandum opinion in response to a motion after verdict that the damages were excessive, thoroughly analyzed the evidence and concluded the damages were not excessive. Judge BAKER'S analysis is as follows:

"The plaintiff at the time of trial was nearly 26 years of age, having been born on June 1, 1942. His educational background was through the eighth grade, but he was at the time of the accident a journeyman painter, particularly experienced as a steeplejack painter, and he was earning $3.95 per hour for ground work and $4.50 per hour for spray painting. In slipping on the beam, his legs went out in a scissors fashion, and he felt immediate pain. He went down to his hands and knees until help arrived. He was lowered to the floor and taken to the hospital by stretcher and ambulance. At the time, conservative treatment consisting of bed rest, traction and medication was used. He remained in the hospital for a week and then returned to his home. While in the hospital, the pain was intense. He remained home only a few days and then returned to the hospital because of the agony of the pain. He remained there for a month, the first two weeks of which were in traction. A myelogram was done and that was followed by surgery. When he returned home, he was still in pain, and he remained at home and in bed for most of the time for another month. He testified that it was nearly a year before he tried to work again. He wore a brace.

"In his first attempt to return to gainful employment, he opened a small restaurant, but this job lasted only two weeks because he was unable to stand the pain,

which increased as he stood long hours on his feet. It was at this time that Dr. Sattler, an orthopedic surgeon of Kenosha, sent the plaintiff to be examined by Dr. Wirka in Madison. He remained at the University Hospital in late May and early June of 1966 for a period of two weeks. He next tried to work as a shoe salesman, but he could handle this job for no longer than two months. His next job was at a McDonald hamburger stand, and he worked there nearly a year, terminating his employment sometime in early '67. Thereafter and until the date of trial, he had no employment. He testified that the pain had continued constantly through this period and at the time of trial. Dr. Sattler was called as a witness and the deposition of Dr. Wirka was read into evidence. The diagnosis of the problem was a herniated disc between L-4 and L-5. The surgery was, of course, to remove the disc and then do a laminectomy to cause a fusion from L-4 to L-5 to S-1. This involved a bone graft. While the plaintiff came through the surgery well, he seemed to have, according to Dr. Sattler, more pain than was expected during the post-operative period. He was seen quite often at the doctor's office thereafter; and finally, in November of 1965, the x-rays revealed that there was a good fusion between S-1 and L-5, but that the bone graft did not take between L-4 and L-5, and this is the cause of the plaintiff's pain and suffering and disability.

"The record shows the innumerable examinations made by the doctors throughout the months following with constant complaints of pain and findings of limitation of motion. Dr. Sattler testified that this unhealed condition existing between L-4 and L-5 was permanent, and that in his opinion the plaintiff suffered a disability of from 15 to 20% of the body as a working unit. The doctor stated that in the future this man should not ever bend more than 30% forward and at the same time lift over 40 pounds. Further, if he bends 50%, he must not lift more than 20 pounds. Dr. Wirka substantially confirms the findings of Dr. Sattler. Obviously, plaintiff cannot resume the occupation he had trained himself to do, and his lack of education or training for any other job creates a tremendous economic problem for him. The jury allowed $14,500.00 for loss of earning capacity to the date of trial. This figure is within the realm of reason because his work as a painter would have brought him for that period of time total earnings of $17,889.40.

Actually, he earned during the period of nearly three years the sum of $3,166.68.

"The jury found that his personal injuries entitled him to an award of $75,000.00. Under the instructions of the court, the jury were to include pain and suffering, physical disability, both past and future, and future loss of earning capacity. This young man's future is a problem—he will not be able to return to his former trade; the doctors apparently do not recommend a second attempt at fusion. His disability is such that he cannot lead a normal life with respect to sports as relaxational activities. The value of the pain and suffering and of the deprivations brought about by the disability are at best uncertain; but for that very reason, it is the policy of the law to place the decision in the hands of a jury. If one considers the probable earning years that this plaintiff might well have enjoyed from age 26 to age 65, the jury award would not seem to be excessive. Assuming an earning of $4.10 per hour for a 40 hour week and (to be conservative) for 40 weeks a year, he would have a gross earning of $6,560.00 per year. In 39 years, he would have earned $255,840.00. Obviously, such a method of evaluation must be reduced to present value. By using the tables that are included in American Jurisprudence Second, Desk Report, page 332, the present value of a sum which would pay the plaintiff such an annual salary for a period of 39 years, computed at 5%, would be $116,631.52. If the computation were made at the rate of 6% per annum, the present value would be $108,065.44. Thus, taking into consideration the probability of the loss of earning capacity, together with an award for pain and suffering and physical disability, the sum of $75,000.00 is not excessive in the view of this trial court."

Anaconda's complaint is that because the plaintiff suffered only a 15 to 20 percent permanent partial disability to the body as a whole the damages are excessive.

We believe Judge BAKER fully considered the plaintiff's percentage of disability of the body as a whole, together with the other evidence as to loss of earning capacity and pain and suffering.

In *Burke v. Poeschl Brothers, Inc., supra,* at page 236, we stated:

"Where the analysis by the trial court is complete, this court need not 'review the entire record as a matter of first impression and ascertain whether, in its judgment, the verdict is excessive.' "

We agree with the trial court that under the evidence most favorable to the plaintiff the damage award is not excessive.

The jury found Ballard 20 percent negligent because of its failure to provide a safe place of employment for its employee, the plaintiff Young. The trial court ordered Ballard to pay Anaconda an amount equal to 20 percent of the plaintiff's judgment against Anaconda by virtue of the indemnity or save harmless provision of the contract entered into between Anaconda and Ballard.

Anaconda asserts that by virtue of the indemnity provision it should be reimbursed in full. Ballard argues that it should not be liable in any amount because its entire liability is under the Workmen's Compensation Act.

The contract provision is as follows:

"(d) Contractor shall at all times indemnify and save harmless Anaconda American Brass Company on account of any and all claims, damages, losses, litigation, expenses, counsel fees and compensation arising out of any injury (including death) sustained by, or alleged to have been sustained by, the servants, employees or agents of Anaconda American Brass Company or the Contractor, its subcontractors or materialmen, the public and its servants, employees or agents, any or all persons on or near the work, or any other person or arising out of loss or damage to any property, real or personal, if such injury or such loss or damage is caused in whole or in part by the acts or omissions of the Contractor, its subcontractors or materialmen, or anyone directly or indirectly employed by them or anyone of them while engaged in the performance of this contract."

In considering this problem of indemnity we start with the legal proposition that, by virtue of the Workmen's

Compensation Act, an employer's liability to his injured employee is limited to the liability imposed by the act.[5]

The court has, however, recognized that the employer can forego his statutory limitation of liability to third persons by an express contract.

"It is clear from this court's holding in *Engel v. Bindel* (1965), 27 Wis. 2d 456, 459, 460, 134 N. W. 2d 404, that indemnification for employee's injury under these circumstances can only be predicated upon an express contractual provision. It was said in that case:

" 'In *A. O. Smith Corp. v. Associated Sales & Bag Co.* (1962), 16 Wis. (2d) 145, 113 N. W. (2d) 562, the court considered several prior cases and text authorities dealing with employer's liability to the employee and third-party tort-feasors, and stated at page 149:

" ' "What we have held in these cases is that the sole liability of an employer because of the injury of an employee in the course of his employment, either to the employee or to anyone else, is under the Workmen's Compensation Law."

" 'We have, however, recognized that the rule of no liability of the employer over and above that imposed by the Workmen's Compensation Act does not apply in case of an *express* agreement for indemnification. See *Hintz v. Darling Freight, Inc.* (1962), 17 Wis. (2d) 376, 117 N. W. (2d) 271; *Huck v. Chicago, St. P., M. & O. R. Co.* (1958), 5 Wis. (2d) 124, 92 N. W. (2d) 349.

" '. . . we have concluded the legislature intended to limit the liability of the employer in exchange for his absolute liability under the Workmen's Compensation Act. If the liability of the employer is to be extended beyond the limits intended by the legislature it should not be by a legally implied agreement to indemnify.' " *Algrem v. Nowlan* (1967), 37 Wis. 2d 70, 75, 76, 154 N. W. 2d 217.[6]

Anaconda contends that the language of the indemnity agreement, "if such injury or such loss or damage is

---

[5] *See* sec. 102.03 (2), Stats.

[6] *See Hartford Accident & Indemnity Co. v. Worden-Allen Co.* (1941), 238 Wis. 124, 297 N. W. 436, and *Mustas v. Inland Construction, Inc., supra.*

caused in whole or in part by the acts or omissions of the Contractor," is sufficient to require Ballard to fully indemnify Anaconda. We think not. The language of the agreement strictly construed does not expressly provide Ballard will indemnify Anaconda for Anaconda's tortious acts.

In *Algrem v. Nowlan, supra,* at pages 76, 77, we stated:

"In cases where the damage results solely from the negligence of the indemnitee, and the indemnitee seeks recovery from the indemnitor, this court and the overwhelming majority of other state courts apply the rule that the indemnity contracts will be strictly construed. In *Mustas v. Inland Construction, Inc.* (1963), 19 Wis. 2d 194, 120 N. W. 2d 95, 121 N. W. 2d 274, this court held a broad indemnity clause inapplicable because it did not expressly provide for indemnification of damages caused solely by the negligence of the indemnitee."

In this case, as well as the assumed facts of *Algrem,* the injury to the employee was caused by the combined negligence of the indemnitee and the indemnitor. We believe *Algrem* must be construed to hold that the indemnitor is not liable for such portion of the total liability as is attributable to the acts of the indemnitee unless the indemnity contract by express provision and strict construction so provides; and that the indemnitor is liable for such portion of the total liability as is attributable to the indemnitor's acts if provided for without a strict construction of the agreement.

This in effect is a recovery similar if not identical to contribution. It is not contribution in a strict sense because contribution is an equitable right not based on contract and the employer is relieved of contribution by virtue of the Workmen's Compensation Act. But because it is clear the employer can give up his statutory protection by contract it follows he can agree to be liable for that part of the total liability attributable to him. We conclude, therefore, that the trial court correctly determined that Ballard was obligated to indemnify

Anaconda to the extent of 20 percent of the jury award to the plaintiff.

Ballard cites the recent case of *Larsen v. J. I. Case Co.* (1968), 37 Wis. 2d 516, 155 N. W. 2d 666, as authority for its position that if there was any causal negligence on the part of Anaconda, Ballard need not indemnify Anaconda. If the language of *Larsen* must be construed to mean that an indemnitor is not liable for the portion of the liability attributable to it after it has agreed by contract to such liability, such language is withdrawn.

Ballard, in his motion to review, asserts several other errors. We have examined the record and conclude they do not have merit; we will, therefore, treat them in a perfunctory manner.

It is contended there is no evidence in the record that Ballard was negligent. It appears without dispute that he knew, in fact directed, his employees to use the crane as a means of getting a platform on the trestles. Mr. Lewis Ballard, a partner and supervisor on the job, testified the cranes and other machinery would be used to get access to the areas to be painted; that he did not, nor did he direct others, to inspect the cranes or the rails and that no warning was given to Young other than a general warning to be careful. The safe-place statute imposes a duty upon the employer to furnish a safe place of employment. The jury could conclude that Ballard's failure to inspect or warn did constitute causal negligence.

Ballard requested a specific personalized instruction on comparative negligence which emphasized that Young's negligence was not to be carried over to Ballard. The instruction was refused and a general standard instruction on the comparison of negligence of more than two persons was given.

Even though not erroneous, personalized instructions are not favored.

The trial court in passing on motions after verdict, referring to the requested instruction, stated:

"This instruction was not given simply because the court believed that its own wording of the comparative negligence instruction clearly set forth that the assessment of negligence was to be with respect to the contribution each party individually made to the accident situation."

We have examined the instruction given; it was adequate—not error—and certainly not prejudicial error.

Ballard contends the trial court abused its discretion in allowing Anaconda to amend its complaint three weeks before trial so as to allege a safe-place violation on the part of Ballard and, as such, change its theory of liability.

There is no showing that Ballard could not prepare his defense to the amended complaint. We conclude it was not an abuse of discretion to allow the amendment.

The final contention is that the judgment does not conform to the trial court's decision insofar as Ballard's obligation to Anaconda is concerned. Ballard's brief states, "This matter is important only from the standpoint of the question of interest."

If the order for judgment and the judgment do not, in the opinion of a party, conform to the decision or memorandum opinion of the trial court it is incumbent upon the party claiming such nonconformity to make a motion in the trial court to amend the judgment before the matter will be reviewed by this court. The alleged error, if it be one, will, we assume, be corrected by the trial court. A search of the record does not reveal such motion was made. The alleged error will not be reviewed.

*By the Court.*—Judgment affirmed.