IN MATTER OF ESTATE OF POPP, Deceased: SHEEDY, Successor Personal Representative of the Estate, and others, Respondents, v. POPP, Appellant.

*No. 75–811. Argued February 7, 1978.—Decided April 5, 1978.*
(Also reported in 264 N.W.2d 565.)

For the appellant there was a brief by *Lichtsinn, Dede, Haensel & von Bereghy, S. C.* and oral argument by *Eldred Dede,* all of Milwaukee.

For the respondents there was a brief and oral argument by *Patrick T. Sheedy* of Milwaukee.

CONNOR T. HANSEN, J. Wallace W. Popp died January 25, 1969, survived by his former wife, Helen M. Popp, the appellant in the instant appeal; by his son, William W. Popp; and by two daughters. The single asset of the estate of Wallace W. Popp relevant to this appeal was a 25-unit apartment building located in the city of Milwaukee. This building was appraised, in the inventory, at $225,000, subject to two mortgages in the total amount of $152,865.65.

By a will executed October 18, 1962, Wallace W. Popp had devised and bequeathed his entire estate, after payment of debts, obligations and taxes, to his then wife, Helen M. Popp, and had appointed her as executrix of the will. The will was admitted to probate in the county court of Milwaukee county, probate division, on January 31, 1969, and Helen was appointed as personal representative of the estate.

Proceedings in the estate were soon complicated by what has proved to be a long and acrimonious dispute between Helen M. Popp and her son, William. The basis of this dispute is not apparent from the present record. However, it is evident that this dispute is a significant

reason for this estate remaining unsettled more than nine years after the death of Wallace W. Popp.

Because the present appeal is the result of an extended course of litigation, the facts are somewhat confusing. This confusion is compounded by the failure of the respective parties to set forth, with clarity, what we perceive to be the pertinent facts or the issues they apparently intend to raise on appeal. The situation is further aggravated by the fact that the respondent, personal representative, has not addressed the issues advanced by the appellant.

We conclude that the following facts are germane to this appeal.

In May, 1970, Helen and William attempted to resolve their differences in a compromise agreement. This agreement, approved by the probate court, provided in essence that upon completion of administration of the estate, William would receive a one-third interest as a tenant in common in the apartment building, subject to the outstanding mortgages. In exchange, he would not contest Helen's right to the estate and insurance proceeds, and would pay a share of the administration expenses and estate and inheritance taxes.

Helen soon encountered difficulty administering the estate. Her accounts, filed periodically through August 25, 1975, showed a persistent deficit. Because of the insolvency of the estate—which Helen attributes to William's failure to pay his share of expenses and taxes pursuant to the May, 1970, compromise agreement—the estate was not closed.

To enable the outstanding claims and expenses to be paid and the estate to be closed, the probate court in November, 1974, ordered the sale of the apartment building. Helen was given the option, however, to meet any public offer for the property. When an offer of $265,000 was received, Helen elected to reject the offer, retain

title to the real estate, and pay the estate an amount equal to the net amount which would have been realized from the $265,000 offer. Helen was subsequently unable to fulfill this obligation, a fact which she ascribes to William's alleged failure to comply with the compromise agreement.

On September 9, 1975, Helen was removed as personal representative, and Patrick T. Sheedy, the respondent on this appeal, was appointed successor personal representative (hereinafter personal representative). He petitioned the court for permission to sell the real estate for $240,000.

A hearing was held before Judge J. K. CALLAHAN on October 6, 1975; the petition to sell the real estate was granted and Judge CALLAHAN ordered the sale of the real estate. However, the order for sale was signed by Judge MICHAEL T. SULLIVAN on October 20, 1975, and herein lies the difficulty. Helen now claims that the order for sale signed by Judge SULLIVAN did not conform to the order for sale pronounced by Judge CALLAHAN at the conclusion of the hearing on the petition for sale.

The building was sold and the proceeds disbursed in accordance with the order for sale entered by Judge SULLIVAN. After the disbursement of the funds in accordance with this order, the estate found itself with insufficient funds to pay the outstanding administration expenses, claims and taxes.

The parties now seek to assign responsibility for the apparent insolvency of the estate.

Helen and the personal representative each petitioned the county court for relief from the October 20, 1975, order for sale on various grounds, in an effort to restore the estate to solvency. These petitions were denied. Helen now appeals from the order for sale. Still pending in the probate court are Helen's petition for payment of

her claim and advances in the amounts of $1,439.91 and $18,855.97, respectively, and the personal representative's petition to have Helen's account surcharged on the ground that she is responsible for the insolvency of the estate.

On this appeal, Helen does not contest the sale of the real estate, but rather challenges the method in which the sale proceeds were disbursed pursuant to the order for sale, asserting that this disbursement has caused the insolvency of the estate.

At the time of the October 6, 1975, hearing before Judge CALLAHAN which resulted in the order for sale, there were two potential obstacles to sale of the real estate. First, William was entitled, under the compromise agreement of May, 1970, to receive a one-third interest in the property upon the completion of administration of the estate. Second, Helen M. Popp had, on March 22, 1974, signed a security agreement covenanting that she owned the real estate and purporting to convey a security interest therein to the First Wisconsin National Bank of Milwaukee, in exchange for credit to a business owned by her. At the time of sale, this security interest was in the amount of $58,453.91.

Both of these possible clouds on the title were discussed at the October 6, 1975, hearing before Judge CALLAHAN, and were addressed in the written order signed by Judge SULLIVAN on October 20, 1975. The order for sale signed by Judge SULLIVAN directed that William be paid the sum of $35,000 in final settlement of his claims in the estate; that the First Wisconsin National Bank of Milwaukee release its security interest in the real estate in exchange for a security interest in the sale proceeds; and that the proceeds remaining after payment to William be disbursed in such manner as the attorneys for Helen and the First Wisconsin National Bank of Milwaukee might jointly direct.

Pursuant to this order, William was paid $35,000, and $58,453.91 was paid to the First Wisconsin National Bank of Milwaukee as a partial distribution of Helen's residuary share of the estate. Although the order authorized the successor personal representative to withhold from any amounts distributable to Helen a reasonable amount for the payment of taxes, debts, fees and expenses owing in the estate, no such amount was withheld.

Additional facts are set forth in discussion of the issues, which we consider to be:

1. Did the written order for sale improperly enlarge or vary the oral pronouncement of the presiding judge from the bench?

2. Did the order for sale improperly provide for distributions to residuary beneficiaries prior to payment of administration expenses and allowed claims?

3. Should the order for sale have limited William Popp's payment to out-of-pocket expenses in the amount of $11,295.31, instead of directing payment to him of $35,000?

4. Are the remaining issues raised by the parties properly before this court on the present appeal?

Helen contends that the written order entered October 20, 1975, should not have authorized distribution of sale proceeds to William or to the bank. At the October 6, 1975, hearing, she contends, Judge CALLAHAN approved an order for sale and nothing more. The subsequent written order, prepared by the personal representative and signed by Judge SULLIVAN, not only authorized the sale, but also authorized distributions to William and to the First Wisconsin National Bank of Milwaukee for the benefit of Helen. She acknowledges that these items were discussed at the hearing, but insists that Judge CALLAHAN did not intend them to be

included in the order for sale. She argues that the written order of October 20th must be conformed to the oral pronouncement of Judge CALLAHAN.

This court has held that the oral pronouncement of an order may be effective, insofar as it concerns the parties and the trial court, even though it has not been reduced to writing. *State v. Powell,* 70 Wis.2d 220, 222, 234 N.W.2d 345 (1975) ; *State ex rel. Hildebrand v. Kegu,* 59 Wis.2d 215, 216, 207 N.W.2d 658 (1973). The judicial act is complete when the order is announced from the bench; reducing it to writing is merely a ministerial act to preserve evidence of the order. *State ex rel. Hildebrand v. Kegu, supra,* at 216.[1]

Although sec. 270.53, Stats. 1973, defined an "order" as a ". . . direction of a court or judge made or entered in writing and not included in a judgment. . . ," this court has said that:

". . . the written order is not necessarily the decision of the court, but generally is merely evidence thereof. The announcement from the bench is the order or judgment in fact. . . ." *German American Bank v. Powell,* 121 Wis. 575, 577, 578, 99 N.W. 222 (1904), *cited* with approval in *State ex rel. Hildebrand v. Kegu, supra,* at 216.

Helen would conclude from the foregoing that a written order may not alter or deviate from the previous oral pronouncement of the court. At least one court has held that courts have a definite and manifest legal duty to

---

[1] However, the order must be reduced to writing to confer appellate jurisdiction and render an order appealable. *Tadysak v. Foht,* 78 Wis.2d 582, 585, 255 N.W.2d 87 (1977) ; *Naus v. Jt. S. D. No. 1 Sheboygan Falls,* 76 Wis.2d 104, 250 N.W.2d 725 (1976) ; *State v. Powell, supra; Dumer v. State,* 64 Wis.2d 590, 611, 219 N.W.2d 592 (1974) ; *State ex rel. Hildebrand v. Kegu, supra.*

conform a written order to the judicial decision actually made. *In Re Roberts,* 19 Cal. Rptr. 147, 149, 200 Cal. App.2d 95 (1962). On the facts of the present case, however, we are of the opinion that Helen has waived any right to argue that Judge CALLAHAN did not˙ authorize disbursements to William and the bank.

A copy of the order was served on Helen's attorney four days before it was signed by Judge SULLIVAN. Her attorney raised no objection that Judge CALLA-HAN had not authorized disbursements but did reserve the right to object to the amount of the payment to William.

On December 4, 1975, Helen M. Popp authorized and directed the estate to pay $58,453.91 to the First Wisconsin National Bank of Milwaukee as a partial distribution of her share of the estate. Again, she raised no objection that such a distribution had not been authorized.

By a motion filed January 28, 1976, Helen sought relief from the written order on the ground that it did not conform to the order pronounced by Judge CALLA-HAN. The only nonconformity asserted, however, concerned Helen's allegation that the parties had not agreed that William would receive $35,000, and that the presiding judge had not ordered payment in such amount.

This motion, which was ultimately denied, did not assert that Judge CALLAHAN had not authorized distributions to beneficiaries. On the contrary, it urged the court to conform the written order of Judge SULLI-VAN to the order made in open court, "as per" the draft order prepared by the personal representative on October 10, 1975, which had provided for such distributions.

Helen never argued in the trial court that Judge CALLAHAN did not authorize any distribution to William or the bank. This issue was never brought before

the trial court. Therefore review is precluded by the principle stated in *Young v. Anaconda American Brass Co.*, 43 Wis.2d 36, 57, 168 N.W.2d 112 (1969):

"If the order for judgment and the judgment do not, in the opinion of a party, conform to the decision or memorandum opinion of the trial court it is incumbent upon the party claiming such nonconformity to make a motion in the trial court to amend the judgment before the matter will be reviewed by this court. The alleged error, if it be one, will, we assume, be corrected by the trial court. A search of the record does not reveal such motion was made. The alleged error will not be reviewed."

This principle is applicable here and the first argument advanced by Helen is precluded from review.

In any event, the transcript of the October 6, 1975, hearing shows that Judge CALLAHAN intended that the order for sale direct the disbursement of the funds. Counsel for William specifically stated that he would withdraw any objections to the sale on the condition that William would receive a settlement in cash at the closing. The personal representative stated that, to facilitate the sale, he had agreed that he would retain the remainder of the proceeds until Helen resolved her differences with the bank. The parties agreed to such an arrangement, and Judge CALLAHAN then said, "Draw an order for sale."

It is apparent from this record that the provisions for distribution of the proceeds were necessary to facilitate the sale; that they were an integral part of the proposed sale as it was presented to Judge CALLAHAN; and that they were within his contemplation when he instructed the personal representative to draw the order for sale. There is therefore no merit to the argument that Judge CALLAHAN did not authorize partial disbursement of the sale proceeds.

Helen next argues that the order for sale authorized distributions to residuary beneficiaries before payment of costs, expenses, fees, claims and taxes, as provided by sec. 859.25, Stats.[2] which specifies the priority in which claims and allowances are to be paid by the personal representative. Helen correctly argues that as a general principle, partial distributions of an estate may not be made before final judgment, if, as a result of the financial position of the estate, claimants under sec. 859.25 wil be prejudiced thereby. *See:* Sec. 863.01.

The present record does not lend itself to an exact determination of the financial position of the estate at the time the order for sale was entered. It appears, however, that the liabilities of the estate included al-

---

[2] Sec. 859.25, Stats., provides:

". . . *Priority of payment of claims and allowances.* (1) CLASSES AND PRIORITY. At the time of their allowance, all claims and allowances shall be classified in one of the following classes. If the applicable assets of the estate are insufficient to pay all claims and allowances in full, the personal representative shall make payment in the following order:

"(a) Costs and expenses of administration.

"(b) Reasonable funeral and burial expenses.

"(c) Provisions for the family of the decedent under ss. 861.31, 861.33 and 861.35.

"(d) Reasonable and necessary expenses of the last sickness of the decedent, including compensation of persons attending him.

"(e) All debts, charges or taxes owing to the United States, this state or a governmental subdivision or municipality of this state.

"(f) Wages, including pension, welfare and vacation benefits, due to employes which have been earned within 3 months before the date of the death of the decedent, not to exceed $300 in value to each employe.

"(g) Property assigned to the surviving spouse under s. 861.41.

"(h) All other claims allowed.

"(2) NO PREFERENCE WITHIN CLASSES. Preference shall not be given in the payment of any claim over any other claim of the same class, nor shall a claim due and payable be entitled to a preference over claims not due."

lowed claims in the amount of several thousand dollars, income taxes for 1975, various advances made by Helen as personal representative, and attorneys' fees. Because of the state of the record, we cannot determine the precise amount of these liabilities of the estate. However, they appear to be substantial.

Helen maintains that the probate court could not, consistent with the provisions of sec. 859.25, Stats., and the general requirements of probate administration, authorize disbursements to beneficiaries before these items were paid. However, Helen is not in a position to challenge the action of the trial court in authorizing either a disbursement to Helen herself or a disbursement to William because she agreed to both distributions. Although she is in a position to raise the crucial separate issue of the amount of the disbursement to William authorized by Judge CALLAHAN, she has waived any objections to the fact that the funds were disbursed.

First, in return for the release of the bank's security interest, the order provided for disbursement of funds in such manner as the attorneys for Helen and the bank might jointly direct. Helen expressly authorized and concurred in such a disbursement and cannot now be heard to complain that the disbursement was improper.

Second, the record shows that counsel for Helen agreed at the October 6, 1975, hearing that a portion of the proceeds would be paid to William. At that hearing, William's attorney stated that William would accept a cash settlement at the time of the closing. The record discloses that upon direct inquiry from Judge CALLAHAN at the hearing on the petition for sale, neither Helen nor anyone else objected to a cash settlement with William at the closing of the sale.

Although it was later argued by Helen that she had not consented to payment of William, the record shows

that she did, in fact, agree to the sale of the real estate; that payment to William was considered at the hearing as an integral part of the sale transaction; and that Helen voiced no objection regarding payment to William. This record abundantly supports the conclusion of Judge SULLIVAN at subsequent hearings that the parties had agreed to a payment to William.

Because Helen affirmatively agreed to disbursements to William and the bank at the time the order for sale was entered by Judge CALLAHAN from the bench, she cannot now argue that they were improper.

We next consider the issue of whether the order for sale executed by Judge SULLIVAN properly authorized a disbursement to William in the amount of $35,000. It is our opinion that the order incorrectly authorized such a disbursement and that it did not conform to the agreement of the parties or the order for sale pronounced by Judge CALLAHAN at the conclusion of the hearing on the petition for the order for sale of the real estate.

We would first observe that although William W. Popp is a named respondent, he has declined to participate in this appeal. His lawyer was served with a copy of the notice of appeal. By letter dated November 11, 1976, his lawyer advised this court that William W. Popp "a named respondent in the . . . action," had requested his office not to participate in the appeal by filing a brief in behalf of William.

At the October 6, 1975, hearing before Judge CALLAHAN, counsel for William stated that William would accept $35,000 in cash at the closing of the sale in final settlement of his claims. William's lawyer went on to state that, ". . . not as part of the stipulation but as a gesture of a son to a mother. . . ," William would not

accept any portion of the $35,000 beyond the amount he had expended in the litigation in connection with the estate, an amount which later proved to be $11,295.31. William twice consented to this limitation, and the trial court stated its approval.

Helen argues that on this record any payment to William should have been limited to $11,295.31. Following the hearing, the personal representative prepared an order which would have had this effect. He then revised the order, however, so as to pay William $35,000.

However, when asked to approve the form of the order directing payment of $35,000 to William, Helen's lawyer had advised the personal representative, by letter, that the order did not correspond to his recollection of the proceedings, but that the transcript would be unavailable for several months. Pending review of the transcript, Helen's lawyer reserved Helen's rights in regard to William's statement that he would accept an amount equal to his expenses as his share of the estate.

The order, revised to pay William $35,000, was signed by Judge SULLIVAN on October 20, 1975. Nevertheless, William's lawyer informed the personal representative, by letter dated December 2, 1975, that William would accept $11,295.31, the amount of his expenses in the litigation, as full payment. Shortly thereafter William's lawyer advised the personal representative, by letter, that William had ". . . had a change of heart," and insisted on payment of the full $35,000.

Helen subsequently petitioned for relief from the order on various grounds,[3] including the ground of mistake, under sec. 269.46(1), Stats. 1973, and the ground that the order did not reflect a stipulation made as re-

[3] The personal representative also petitioned unsuccessfully for relief from the order. His petition is not relevant to this appeal.

quired by sec. 269.46 (2), Stats. 1973.[4] At the hearing on these petitions, before Judge SULLIVAN, the personal representative and William's lawyer stated their recollection that the offer to limit William's share had been made, not as part of the stipulation, but rather as a gratuitous and, they thought, off-the-record gesture. The petitions for relief from the order were denied, and William was paid $35,000.

On this appeal, Helen renews her argument that the order for sale should be modified to limit William's payment to the amount of his expenses, in accordance with what she contends was the agreement made in open court and the order of Judge CALLAHAN.

Although William's lawyer stated at the hearing that the limitation was agreed to ". . . not as part of the stipulation but as a gesture of a son to a mother. . ." and "voluntarily," we conclude that this limitation is inseparable from the remainder of the stipulation and should be enforced.

The record shows that William's lawyer stated that William would not accept any amount over the amount of his expenses, and that William agreed that this was

[4] Sec. 269.46, Stats. 1973, provided in relevant part:

". . . Relief from judgments, orders and stipulations; review of judgments and orders. (1) The court may, upon notice and just terms, at any time within one year after notice thereof, relieve a party from a judgment, order, stipulation or other proceeding against him obtained, through his mistake, inadvertence, surprise or excusable neglect and may supply an omission in any proceeding. In addition to the required affidavits, all motions to vacate a judgment entered upon default or cognovit and to obtain a trial upon the merits shall be accompanied by a proposed verified answer disclosing a defense.

"(2) No agreement, stipulation or consent, between the parties of their attorneys, in respect to the proceedings in an action or special proceeding, shall be binding unless made in court and entered in the minutes or made in writing and subscribed by the party to be bound thereby or by his attorney."

correct. The presiding judge then asked Helen's lawyer, ". . . You are agreeable to this whole thing?" and her lawyer said that he was. William's lawyer repeated that William would not accept any amount beyond the amount of his expenses. When Helen said that she didn't understand, he again repeated this statement, and William again agreed to the limitation. William's expenses were twice stated in open court to be in the approximate amount of $11,000, and the exact amount of the expenses was fixed at $11,295.31 in the letter of December 2, 1976, from William's lawyer to the personal representative.

On this record, it is clear that the limitation was an inextricable part of the stipulation, was relied upon by Helen, and cannot be extracted from the bargain. Despite the disclaimer expressed by William's lawyer, the record demonstrates that the offer extended by William, and agreed to by the parties and the trial court, was that William would receive the lesser amount.

In a proper case, this court will modify the decision of a trial court to reflect the stipulation of the parties on which the decision is founded. *See, e.g., Holsen v. Marshall & Ilsley Bank,* 52 Wis.2d 281, 288, 289, 190 N.W.2d 189 (1971).

We therefore conclude that the order of October 20, 1975, entered by Judge SULLIVAN, should be modified to direct payment of $11,295.31 to William instead of $35,000, and it is so ordered.

In the case before us, there has been no showing as to why the judge who presided over the hearing of the petition for the sale of the real estate did not sign the order for sale and the partial distribution of the proceeds of sale. Our attention has not been directed to any authority to support the proposition that a judge who did

not hear the evidence is authorized to enter a dispositive order based upon evidence he did not hear and in a proceeding over which he did not preside. We know of no authority to support such a proposition.

Sec. 256.08, Stats., provides for the continuation of certain pending matters by successor judges after an office becomes vacant by illness, death, retirement or expiration of term of office. Also, sec. 974.02(2) stands as authority for a successor or another judge to hear motions for a new trial in criminal felony cases in the event the trial judge is disabled or no longer in office. *State v. Herfel*, 49 Wis.2d 513, 520, 182 N.W.2d 232 (1971). However, in the instant case neither of these statutes is applicable. While not directly in point, it has been held that a successor judge may not render judgment when he has not seen and heard the witnesses, nor may he make findings of fact in a cause tried and heard by his predecessor. *Cram v. Bach*, 1 Wis.2d 378, 383, 83 N.W.2d 877, 85 N.W.2d 673 (1957); *Fitz v. Industrial Comm.*, 10 Wis.2d 202, 208, 102 N.W.2d 93 (1960). It has also been held that a question requiring the interpretation of a judicial order should be decided by the judge issuing the order. *In re Amalgamated Meat Cutters & Butcher Workmen of North America*, (E. D. Wis. 1975), 402 Fed. Supp. 725, 736.

In the instant case the hearing on the petition for the sale of real estate was conducted by Judge CALLAHAN, and at the conclusion of the hearing he ordered the sale of the real estate. The formal order for the sale of real estate and pretrial distribution of the proceeds should have been executed by him. Such a conclusion is consistent with the general principle stated in *Yanggen v. Wisconsin Michigan Power Co.*, 241 Wis. 27, 31, 4 N.W.2d 130 (1942):

"An order of the court is a high and solemn juridical act and great care must be taken that such an act be performed under due safeguards to protect those whose right it affects. To this end are the requirements that a juridical pronouncement of this nature be made with due regard to certain formalities such as pronouncement in open court, *State ex rel. Wingenter v. Circuit Court* (1933), 211 Wis. 561, 248 N.W. 413; . . . ."

Finally, the parties raise several additional issues, none of which involves the propriety of the order for sale which is the subject of this appeal.

Helen argues that to close the estate, the successor personal representative, ". . . should and can adhere to available legal and statutory procedures." This argument is particularly obscure, but the point appears to be either (1) that the personal representative caused the estate to become insolvent by failing to withhold a reasonable amount for payment of taxes, debts, fees and expenses of the estate from the amount paid to the First Wisconsin National Bank of Milwaukee, or (2) that the estate is not really insolvent, because if William is paid only $11,295.31, then the figures may be arranged so as to pay the various debts and expenses of the estate, with the exception of a portion of certain advances and fees claimed by Helen. She also raises arguments concerning the future conduct of the successor personal representative. These arguments are not directed toward the order for sale, and would more properly be advanced in connection with Helen's petition for payment of her advances and claim, and the personal representative's petition to surcharge Helen's account, both of which are apparently pending in the trial court.

In the "conclusion" of her brief, Helen criticizes the probate court's approval of various attorneys' fees. These fees were approved on February 11, 1976, long after the order for sale was entered.

William has declined to file a brief in this appeal. The successor personal representative has filed a brief which is wholly unresponsive to the issues raised by Helen. Indeed, his argument does not mention the order for sale. Instead, he asserts that Helen is responsible for the apparent insolvency of the estate because she failed to take advantage of an opportunity to sell the real estate for $265,000, and because she used the estate property as collateral for a personal loan.

None of these final arguments advanced by the parties have any relation to the propriety of the order of October 20, 1975, for the sale of the real estate and the partial distribution of the proceeds. They have not been properly raised on appeal, and we do not consider them.

That portion of the order of October 20, 1975, directing payment to William W. Popp in the amount of $35,000 is modified to provide for a payment to him in the amount of $11,295.31, and as modified the order is affirmed.

*By the Court.*—Order modified, and as modified affirmed.