**COURT OF APPEALS
DECISION
DATED AND FILED**

**May 12, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2019AP57**

**STATE OF WISCONSIN**

Cir. Ct. No. 2016CV2850

**IN COURT OF APPEALS
DISTRICT I**

GARY PRICE,

 PLAINTIFF-APPELLANT,

INTERNATIONAL CHIMNEY CORPORATION,

 INVOLUNTARY-PLAINTIFF,

 V.

AMERICAN INTERNATIONAL GROUP, INC.,

 DEFENDANT,

WISCONSIN ELECTRIC POWER CO., D/B/A/ WE ENERGIES,

 DEFENDANT-RESPONDENT.

 APPEAL from an order of the circuit court for Milwaukee County: STEPHANIE ROTHSTEIN, Judge. *Affirmed*.

Before Brash, P.J., Dugan and Fitzpatrick, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM. Gary Price appeals an order granting summary judgment in favor of Wisconsin Electric Power Co., d/b/a WE Energies. In this appeal relating to his personal injury action, Price argues that the circuit court erred when it dismissed his common law negligence and safe place claims. We reject Price's arguments and affirm.

## I. BACKGROUND

¶2     WE Energies contracted with International Chimney Corporation ("ICC") to demolish two chimneys at its Oak Creek power plant. Price, an ironworker employed by ICC, was injured during the demolition of the second chimney ("Chimney No. 4"). At the time of Price's injury, a "gin pole" hoisting apparatus, which was secured by steel tie-back cables, was in use.[1] At the same time, an ICC employee was operating concrete demolition machinery known as a Mantis.[2] Price was injured when the tie-back cables for the gin pole came out of the concrete wall of the chimney he was working on, which caused a section of scaffolding where he was standing to collapse.

---

[1] The gin pole hoisting apparatus was affixed atop Chimney No. 4 and was used to hoist equipment up and down. The gin pole was held in place by two tie-back cables fastened and secured by bolts and pad eyes, which ICC installed into the outer concrete wall of the chimney. This held the vertical gin pole upright to support the weight raised and lowered by the hoist.

[2] The Mantis concrete demolition machinery had three large crawling wheels that were supported by the outer concrete wall. To demolish a chimney column from the top downward, the Mantis slowly rotated and broke off pieces of the outer concrete wall, which were pushed into the hollow chamber of the chimney and fell to the ground.

¶3    Price sued WE Energies alleging that it was negligent and violated the safe place statute.  WE Energies moved for summary judgment on Price's claims.  The circuit court granted the motion, and Price appeals.

¶4    Additional background information is included in the discussion section of this opinion.

## II. DISCUSSION

¶5    Price argues that the circuit court erred when it granted summary judgment in favor of WE Energies.  We independently review a grant of summary judgment, using the same methodology as employed by the circuit court.  *Hardy v. Hoefferle*, 2007 WI App 264, ¶6, 306 Wis. 2d 513, 743 N.W.2d 843.  Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  WIS. STAT. § 802.08(2) (2017-18).[3]

¶6    In reviewing the parties' submissions, we draw all reasonable factual inferences in the light most favorable to the nonmoving party.  *Pum v. Wisconsin Physicians Serv. Ins. Corp.*, 2007 WI App 10, ¶6, 298 Wis. 2d 497, 727 N.W.2d 346 (2006).  Whether an inference is reasonable and whether more than one inference may be drawn are questions of law that we review independently.  *Id.*

¶7    We now turn to Price's common law negligence claim.  As a general rule, "one who hires an independent contractor is not liable in tort for injuries

---

[3] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

sustained by an independent contractor's employee while he or she is performing the contracted work." ***Danks v. Stock Bldg. Supply, Inc.***, 2007 WI App 8, ¶17, 298 Wis. 2d 348, 727 N.W.2d 846. There are, however, two exceptions to the rule of nonliability: where the hiring entity commits an affirmative act of negligence or where the entity has a nondelegable duty because the independent contractor is engaged in extrahazardous work. *See **id.***, ¶¶17, 23 n.4. Price does not dispute that the general rule of nonliability applies or that ICC was WE Energies' independent contractor. Instead, he argues that both of the aforementioned exceptions apply and render WE Energies liable.

### A. *There was no affirmative act of negligence by WE Energies.*

¶8 An owner may be liable for injury to an independent contractor's employee if the owner commits an affirmative act of negligence that increases the employee's risk of injury. *See **Barth v. Downey Co. Inc.***, 71 Wis. 2d 775, 783, 239 N.W.2d 92 (1976). Under this exception to nonliability, negligence alone is insufficient. Rather, there must be "'something extra,' an affirmative act of negligence that increased the risk of injury." ***Wagner v. Continental Cas. Co.***, 143 Wis. 2d 379, 389, 421 N.W.2d 835 (1988) (one set of quotation marks and citation omitted). Whether the owner's conduct constitutes an affirmative act of negligence is a question of law. *See **id.*** at 402.

¶9 Price argues that WE Energies' "constant pressure" constituted an affirmative act of negligence. He specifically contends that WE Energies was affirmatively negligent by continually pressuring ICC to complete demolition at a faster rate, which included forcing ICC to depart from industry standards to keep up with the pace of work demanded and resulted in the prolonged use of the gin pole and the use of the Mantis.

¶10 WISCONSIN STAT. § 802.08(3) requires that summary judgment materials "be made on personal knowledge." However, Price does not direct us to any support beyond his own deposition testimony, which is not based on personal knowledge, for his claims that WE Energies forced ICC to alter its means and methods for demolishing Chimney No. 4 to prioritize speed over safety or that WE Energies forced ICC to depart from industry standards to keep up with the pace of work it demanded. He contends that ICC did not originally plan to utilize the Mantis but subsequently proposed doing so in its recovery plan in order to meet WE Energies' demands for a plan that would get the job back on schedule. During his deposition, however, Price admitted that he did not have personal knowledge concerning whether WE Energies requested the Mantis to speed up the job or whether ICC came to WE Energies and indicated that it planned to use the Mantis, which it had safely used on other jobs.

¶11 Price makes light of the undisputed fact that ICC was an independent contractor solely responsible for selecting the means, methods, and equipment for its demolition work and for supervising its employees. ICC's Corporate Manager Dennis Sweeney authored the letter documenting the recovery plan and participated in high-level project management discussions. Sweeney testified that he drafted the letter documenting the recovery plan to show WE Energies that ICC was striving to make up for lost time on the job. Sweeney further testified that from the beginning, ICC planned to use the Mantis and recommended it as a well designed, safe, and effective machine that ICC had previously used with success. The letter documenting the recovery plan does not suggest that ICC had misgivings about using the Mantis on Chimney No. 4 or that it was unsafe or inappropriate.

¶12    Sweeney specifically denied that WE Energies put pressure on ICC to use the Mantis to speed up the work.  Price argues that WE Energies' Principal Construction Safety Consultant Jim Lindsey told ICC to work faster even if was not safe, but Sweeney denied that this happened and further explained that if Lindsey had said that, Sweeney would not have complied.[4]

¶13    The evidence reflects that ICC, as the independent contractor on this "turnkey project," was in charge of deciding what equipment to use, including the gin pole and the Mantis.[5]  The evidence further reflects that ICC voluntarily proposed the use of the Mantis, which it deemed safe and appropriate to demolish Chimney No. 4.  Price repeatedly asserts in arguments in this court, again relying on his own deposition testimony as support, that WE Energies prohibited ICC from demolishing the top of Chimney No. 4 by hand after ICC workers expressed concerns that the chimney would not bear the weight of the Mantis.  However, according to Price's own testimony, Lindsey, at most, told ICC's workers to adhere to ICC's plan to use the Mantis.

¶14    The undisputed material facts show that the accident occurred after the ICC employee assigned to operate the Mantis concrete demolition machinery, Steve Scyoc, conducted a test run.  ICC's demolition safety plan called for the gin pole to be derigged before operating the Mantis.  Derigging the gin pole would

_____

[4] Lindsey is deceased and did not provide any deposition testimony prior to his death. Price acknowledged at his deposition that Lindsey was not present at the job site on the day Price was injured.

[5] The reference to the turnkey project means that ICC was hired with the understanding that it was an independent contractor that would have total and exclusive responsibility for completing its work, selecting appropriate work processes, the means of demolition and the needed equipment, and for directly supervising its own workers to complete the contracted work, subject only to general contract performance oversight by WE Energies.

have included removing the tie-back cables, the pad eyes, the pole, and sending the equipment from the top of the chimney down to the ground. Scyoc, however, made a unilateral decision to deviate from ICC's plan and start the Mantis with the gin pole still in place. Scyoc operated the Mantis for about thirty minutes when the gin pole tie-back cables and pad eye supports, along with some of the concrete, came out of the wall. A tie-back cable tore through a section of scaffolding railing and the gin pole snapped off at its base and fell over the side of the chimney. Price, who was standing on the scaffolding at the time, testified during his deposition that he suffered injuries as a result of this sequence of events.

¶15   According to Sweeney's deposition testimony: "The machine [i.e., the Mantis] is safe. The operator [i.e., Scyoc] wasn't." No one from WE Energies was on site at the time or was made aware that Scyoc was going to start the Mantis without first derigging the gin pole. Price did not present any evidence that WE Energies directed ICC or its employees to save time by keeping the gin pole rigged while operating the Mantis. At his deposition, Price admitted that nobody told the ICC workers to leave the gin pole up.

¶16   WE Energies did not do anything "extra" here. *See **Wagner***, 143 Wis. 2d at 389. The record shows that there is no genuine issue that ICC exercised its independent contractor rights and duties under the contract and selected the Mantis as a safe and effective method for the demolition of the chimney. The use of the Mantis was on ICC's initiative, not the result of an affirmative act by WE Energies.

**B.  *The demolition work was not extrahazardous.***

¶17   Next, Price argues that the demolition of the chimney, specifically the use of the Mantis on the deteriorated chimney with the gin pole still in place,

was extrahazardous. Not all dangerous work activities will meet the extrahazardous standard. Activities that are inherently dangerous because of the absence of special precautions do not qualify as extrahazardous:

> A person engaged in an activity of the first type, i.e., one that is inherently dangerous without special precautions, can take steps to minimize the risk of injury. Examples include general construction, demolition, and excavation.
>
> By contrast, an activity that is said to be extrahazardous, or abnormally dangerous, is one in which the risk of harm remains unreasonably high no matter how carefully it is undertaken. Examples would include transporting nuclear waste or working with toxic gases.

*See id.* at 392-93 (italics omitted).[6] Whether an activity is extrahazardous is a question of law. *Id.* at 402.

¶18 Price acknowledges that general demolition is considered an inherently dangerous activity to which the extrahazardous exception does not apply. *See id.* at 392. Here, however, he submits that WE Energies' influence over the means and methods of demolishing Chimney No. 4 "turned an ordinary demolition project into an extra[]hazardous one." Because Chimney No. 4 was in an advanced state of deterioration, Price contends that the use of the Mantis in this case presented an unreasonably high risk of harm. Price further contends that, due

---

[6] In his opening brief addressing this issue, Price primarily relies on *Snider v. Northern States Power Co.*, 81 Wis. 2d 224, 260 N.W.2d 260 (1977). WE Energies contends that the viability of *Snider* as relevant authority is questionable given that our supreme court in *Wagner v. Continental Casualty Co.*, 143 Wis. 2d 379, 421 N.W.2d 835 (1988), dismissed portions of *Snider* as dicta and further noted that the court in *Snider* did not distinguish between projects that are inherently dangerous and those that are extrahazardous. *See Wagner*, 143 Wis. 2d at 392; *see also id.* at 404 (Abrahamson, J., dissenting, joined by Heffernan, C.J., and Bablitch, J.) ("The court today overrules *Snider* by reinterpreting it."). Price does not refute WE Energies' position on this point in his reply and, therefore, we deem it conceded that *Wagner* sets forth the applicable legal test for our purposes. *See Charolais Breeding Ranches, Ltd. v. FPC Secs. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979).

to the fast pace of work set by WE Energies, ICC did not have time to properly disassemble and reassemble the scaffolding in compliance with industry practice. According to Price, the activity to be evaluated is "not simply a demolition, but rather a demolition conducted under pressure to speed up."

¶19    As summed up by WE Energies, Price's analysis strips the extrahazardous exception of its unique meaning and renders it a mere echo of the affirmative acts of negligence test. In contrast to the affirmative acts of negligence test, where the focus is on the conduct of the owner in affirmatively contributing to an accident involving an independent contractor's employee, the extrahazardous exception does not focus on the conduct of the owner. *See id.* at 388. Instead, the focus is on the work to be done. *See id.* at 392-93 (focusing its analysis on the activity itself).

¶20    Here, the demolition work was not an extrahazardous activity. ICC's demolition plan called for the gin pole to be derigged before operating the Mantis. Price agreed in his deposition testimony that, if this plan had been followed and if the gin pole had been derigged before the Mantis was operated, the accident would not have happened. The record shows that there is no genuine issue that this demolition work was "abnormally dangerous … [such that] the risk of harm remain[ed] unreasonably high no matter how carefully it [was] undertaken." *See id.* at 392. Therefore, the extrahazardous exception does not apply. *See id.* at 392-93.

### C. *WE Energies is not liable under the safe place statute.*

¶21    Lastly, Price argues that WE Energies owed him a duty under the safe place statute. As relevant here, under the safe place statute, an owner of a place of employment or a public building has a duty to "construct, repair or

9

maintain such place of employment or public building as to render the same safe." WIS. STAT. § 101.11(1). Such an owner is liable for: (1) structural defects, and (2) unsafe conditions associated with the structure of the building.[7] *See Barry v. Employers Mut. Cas. Co.*, 2001 WI 101, ¶¶20-21, 245 Wis. 2d 560, 630 N.W.2d 517. To be liable for an injury caused by an unsafe condition associated with the structure of the building, the owner must have actual or constructive knowledge of that condition. *Id.*, ¶23.

¶22     Here, Price alleges that the unsafe condition associated with the structure was the weaker concrete at the top of Chimney No. 4 and the use of the Mantis while the gin pole was still in place. According to Price, WE Energies' knowledge that the top of the chimney was more deteriorated than the rest of the structure fulfills the notice requirement.

¶23     Price has not presented any evidence that weak concrete contributed to the accident.[8] Rather, the chimneys were turned over to ICC, an expert

---

[7] Based on the case law cited by the parties, they appear to be in agreement that, if WE Energies has a duty under the safe place statute, it would be in its capacity as an owner of a place of employment.

[8] Price's reliance on *Burmek v. Miller Brewing Co.*, 12 Wis. 2d 405, 107 N.W.2d 583 (1961), *overruled on other grounds by Plesko v. City of Milwaukee*, 19 Wis. 2d 210, 220, 120 N.W.2d 130 (1963), is misplaced. Price argues that the circumstances of this case are similar to those in *Burmek*. In that case, the employee of a subcontractor argued that the owner of the building where the employee was injured when he fell off of a roof violated the safe place statute. *Id.* at 410. The court concluded it was the owner's duty to either inform the employee that the roof ended short or "to so illuminate the roof area as to make that condition apparent." *Id.* at 413. The court explained that the owner in that case "knew or should have known that the stacking of the containers in that area so interfered with the light there as to render the open space dark and indistinguishable. It knew or should have known that the [employee] would be working in that area." *Id.* at 412. Price contends that the circumstances of this case are similar because WE Energies was aware of the deteriorated condition of Chimney No. 4. We are not convinced that these cases are analogous, particularly given that the accident here was not caused by the condition of the concrete.

chimney demolition company, because they were deteriorating and needed to be demolished. As detailed above, the record shows that there is no genuine issue that the accident was caused by the condition of the premises. It was caused by the unsafe method of demolition to which safe place liability does not attach. *See Gennrich v. Zurich Am. Ins. Co.*, 2010 WI App 117, ¶23, 329 Wis. 2d 91, 789 N.W.2d 106 (explaining that ordinary negligence focuses on negligent activities whereas safe place law focuses on the condition of the premises itself); *see also Hofflander v. St. Catherine's Hosp. Inc.*, 2003 WI 77, ¶91, 262 Wis. 2d 539, 664 N.W.2d 545 ("Wisconsin's safe place statute governs only unsafe physical conditions of premises. It does not involve reckless or negligent acts of persons on the premises.").

¶24     Insofar as Price argues that WE Energies should be subjected to safe place liability because it "exercised a significant amount of control over ICC's demolition of Chimney No. 4," we are not convinced. The test in this regard "is whether the owner … 'stood in the shoes of the (immediate) employer by reason of his retention of control of the premises.'" *See Barth*, 71 Wis. 2d at 781 (parenthetical in *Barth*; citation omitted). The retention or exercise of control over the details of ICC's work is not established by the evidence in this case.

¶25     The circuit court properly concluded that WE Energies was entitled to summary judgment on Price's negligence and safe-place claims.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

11